[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Weber*, Slip Opinion No. 2020-Ohio-6832.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-6832

THE STATE OF OHIO, APPELLEE, *v.* WEBER, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Weber*, Slip Opinion No. 2020-Ohio-6832.]

*Criminal law—Second Amendment—R.C. 2923.15, which prohibits a person from carrying or using a firearm while under the influence of alcohol or a drug of abuse, is not unconstitutional as applied to an intoxicated person carrying a firearm in his or her home.*

(No. 2019-0544—Submitted February 25, 2020—Decided December 23, 2020.)

APPEAL from the Court of Appeals for Clermont County,

No. CA2018-06-040, 2019-Ohio-0916.

_____

O'CONNOR, C.J.

{¶ 1} It has been illegal to carry a firearm while intoxicated in Ohio since 1974. R.C. 2923.15, Am.Sub.H.B. No. 511, 134 Ohio Laws 1866, 1968 (effective January 1, 1974). This case presents the question whether the right to bear arms contained in the Second Amendment to the United States Constitution includes the right to carry a firearm while intoxicated, making Ohio's statute unconstitutional.

We hold that it does not. We therefore affirm the judgment of the Twelfth District Court of Appeals.

## I. BACKGROUND

{¶ 2} At 4:00 a.m. on February 17, 2018, appellant, Frederick Weber, was very intoxicated and holding a shotgun. His wife called 9-1-1. Deputy Christopher Shouse and Sergeant Mark Jarman were dispatched to Weber's house. When they arrived, Weber's wife told them, "Everything is okay, he put it away." But when Shouse stepped inside the house, he encountered Weber still holding the shotgun by the stock with one hand. Shouse ordered him to drop the gun. Shouse also heard Weber say, in slurred speech, that the firearm was not loaded.

{¶ 3} Shouse attempted to assess Weber's sobriety by performing a field sobriety test, but Weber could not complete the test because he was unable to follow Shouse's directions. Shouse also noticed the smell of alcohol on Weber, and Weber admitted several times that he was drunk. According to Shouse, Weber was "very intoxicated." When Shouse asked Weber why he had the shotgun, Weber seemed confused and could not give a definitive answer. Shouse picked the shotgun up and determined that it was unloaded. Weber later claimed that he was *unloading* the shotgun to wipe it down.

{¶ 4} Jarman observed that Weber's speech was slurred and his eyes were glassy and bloodshot. Weber was also unstable on his feet. According to Jarman, "he was actually swaying while [Shouse] had him in the instruction position." Jarman described Weber as "[v]ery impaired" and "highly intoxicated."

{¶ 5} Weber was charged with violating R.C. 2923.15(A), which provides that "[n]o person, while under the influence of alcohol or any drug of abuse, shall carry or use any firearm or dangerous ordnance." A violation of this provision is a first-degree misdemeanor. R.C. 2923.15(B). After a bench trial, Weber was found guilty and sentenced to ten days in jail, with all ten days suspended. He was also placed on community control for one year, ordered to complete eight hours of

community service, and fined $100. The Twelfth District Court of Appeals affirmed his conviction.

{¶ 6} Weber raised four propositions of law in a discretionary appeal to this court. We accepted three for review. *See* 156 Ohio St.3d 1452, 2019-Ohio-2780, 125 N.E.3d 941.

> Proposition 1: "The using a weapon while intoxicated statute is unconstitutional as applied to the facts of this case."
>
> Proposition 2: "Where a challenge is made that a statute unconstitutionally impinges on the fundamental right to bear arms, review is undertaken employing a strict scrutiny standard."
>
> Proposition 3: "Under any of the standards of scrutiny applied to enumerated constitutional rights, a prohibition of having firearms while intoxicated in the home—where [the need for] defense of self, family and property is most acute—fails [to pass] constitutional muster."

In all three propositions, Weber argues that R.C. 2923.15 violates the Second Amendment to the United States Constitution as applied to the facts of this case.

## II. APPLICABLE LAW

{¶ 7} The constitutionality of a statute is a question of law that we consider de novo. *See Cleveland v. State*, 157 Ohio St.3d 330, 2019-Ohio-3820, 136 N.E.3d 466, ¶ 15.

### A. District of Columbia v. Heller

{¶ 8} The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The United States Supreme Court held in *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637

(2008), that the Second Amendment protects a person's right to possess and carry weapons for self-defense. But the court did not hold in *Heller* that *every* regulation impairing the possession or carrying of weapons in some way is automatically unconstitutional. *Heller* makes it clear that "[l]ike most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

{¶ 9} The Supreme Court emphasized that "nothing in [the opinion] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-627. The court also made clear that it does not "suggest the invalidity of laws regulating the storage of firearms to prevent accidents." *Id.* at 632. And the court recognized "another important limitation on the right to keep and carry arms," *id*. at 627: the Second Amendment protects only the sort of weapons in common use at the time of the Amendment and only when such a weapon is used "for lawful purposes like self-defense," *id.* at 626.

{¶ 10} After this discussion of the Second Amendment, the court turned to the statute at issue in the case. The District of Columbia had generally prohibited the possession of handguns and required even lawfully owned firearms, such as registered long guns, to be "unloaded and dissembled or bound by a trigger lock or similar device" unless they were located in a place of business or were being used for lawful recreational activities, former D.C.Code 7-2507.02, 23 D.C.Reg. 2464 (Sept. 24, 1976). The majority observed that the law "totally ban[ned] handgun possession in the home" and required any lawful firearm in the home to be rendered inoperable. *Heller* at 628. The law therefore barred " 'the most preferred firearm

in the nation' " from being used in self-defense of " 'one's home and family.' " *Id.* at 628-629, quoting *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C.Cir.2007). Such a "severe restriction," *id.* at 629, the court held, violated the Second Amendment "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," *id.*

{¶ 11} The majority also acknowledged that because the case represented the Supreme Court's "first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field." *Heller*, 554 U.S. at 635, 128 S.Ct. 2783, 171 L.Ed.2d 637. The decision therefore did not conclusively determine "applications of the right" to *other* regulations or provide "extensive historical justification for those regulations of the right that [it] describe[d] as permissible." *Id.*

{¶ 12} Subsequently, the court held that the Second Amendment right recognized in *Heller* is applicable to the states. *McDonald v. Chicago*, 561 U.S. 742, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

### B. Cases since **Heller***: the two-step framework*

{¶ 13} After *Heller* was decided, one of the main tasks for courts presented with Second Amendment challenges to firearm regulations was deciding which analytical framework to use. Over the past 12 years, courts have converged on a two-step framework to decide Second Amendment cases. *Kolbe v. Hogan*, 849 F.3d 114, 132-133 (4th Cir.2017) (en banc) (identifying decisions from the Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and D.C. Circuits applying the two-step approach); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir.2018) (adopting the two-step approach after *Kolbe* was decided).

{¶ 14} In the first step of the framework, courts ask whether " 'the challenged statute "regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment," ' " namely, the ratification of the Bill of Rights in 1791 or of the Fourteenth

Amendment in 1868. *Stimmel v. Sessions*, 879 F.3d 198, 204 (6th Cir.2018), quoting *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir.2012), quoting *Ezell v. Chicago*, 651 F.3d 684, 702-703 (7th Cir.2011). If the regulation falls outside the scope of the Second Amendment, the "inquiry is complete," and the law cannot be determined to violate that Amendment. *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir.2010); *accord Stimmel*, 879 F.3d at 204.

{¶ 15} If the reviewing court moves on to the second step, it should "determine and apply the appropriate level of heightened means-end scrutiny" based on whether and how severely a particular law burdens the core Second Amendment right.[1] *Stimmel*, 879 F.3d at 204; *see also Natl. Rifle Assn. of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir.2012) ("In harmony with well-developed principles that have guided our interpretation of the First Amendment, we believe that a law impinging upon the Second Amendment right must be reviewed under a properly tuned level of scrutiny—i.e., a level that is proportionate to the severity of the burden that the law imposes on the right").

{¶ 16} If the challenged law does not severely burden the core of the Second Amendment's protections, the court should apply intermediate scrutiny. *See United States v. Chester*, 628 F.3d 673, 680-683 (4th Cir.2010). Or, as the Sixth Circuit has put it, "in choosing to apply intermediate scrutiny, we are 'informed by "(1) 'how close the law comes to the core of the Second Amendment right,' and (2) 'the severity of the law's burden on the right.' " ' " *Stimmel*, 879 F.3d at 206, quoting *Tyler v. Hillsdale Cty. Sheriff's Dept.*, 837 F.3d 678, 690 (6th Cir.2016) (lead opinion), quoting *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir.2013), quoting *Ezell* at 703. Under intermediate scrutiny, the statute is constitutional so

---

1. Although the *Heller* court stated that the regulation at issue was unconstitutional under any standard, it specifically rejected the possible application of rational-basis scrutiny. *Heller*, 554 U.S. at 628, 128 S.Ct. 2783, 171 L.Ed.2d 637, fn. 27.

long as it furthers an important governmental interest and does so by means that are substantially related to that interest. *Chester*, 628 F.3d at 683. *E.g.*, *United States v. Yancey*, 621 F.3d 681 (7th Cir.2010) (upholding 18 U.S.C. 922(g)(3), which prohibits possession of a firearm by a person who is "an unlawful user of or addicted to any controlled substance," under intermediate scrutiny because "ample" evidence showed "the connection between drug use and violent crime," *Yancey* at 686, and the statute was "substantially related" to the "important governmental interest in preventing violent crime," *id*. at 687).

{¶ 17} If, however, a statute imposes a severe burden on the core of the Second Amendment right, the court should apply strict scrutiny. *See Marzzarella*, 614 F.3d at 96-97. Under strict scrutiny, the statute is constitutional if it furthers a compelling governmental interest and the state's chosen means are narrowly tailored to advance that interest. *Fed. Election Comm. v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007). *E.g.*, *Marzzarella*, 614 F.3d at 100-101 (upholding a federal law prohibiting possession of a firearm with an obliterated serial number under strict scrutiny because the law furthered a compelling governmental interest by assisting law enforcement in the investigation of crimes and the law was narrowly tailored to achieve that objective, because it applied only to weapons made less susceptible to tracing).

## III. ANALYSIS

### A. *The appropriate test for challenges to firearm regulations under the Second Amendment*

{¶ 18} In his initial brief, Weber argues that this court should judge the constitutionality of R.C. 2923.15 using the strict-scrutiny test. In his reply brief, however, Weber argues for a different standard of review: that "absent some legal disqualification (and [being] drunk in your home is not one), the right to have arms in your home is absolute." Appellee, the state of Ohio, urges this court to apply the two-step framework described above.

**{¶ 19}** We believe that the two-step framework provides the appropriate test for Second Amendment challenges to firearm regulations, and we therefore apply it.[2] The two-step framework also leaves room for us to consider Weber's arguments that strict scrutiny should be applied to his claim and that intoxication is not a "legal disqualification" from the protections of the Second Amendment.

### B. The constitutionality of R.C. 2923.15 under the Second Amendment

*1. Step one: does R.C. 2923.15 place a burden on activity within the scope of the Second Amendment?*

**{¶ 20}** The state argues that R.C. 2923.15 does not place a burden on activity within the scope of the Second Amendment. In support, the state and its amici curiae cities of Columbus, Cincinnati, Akron, Dayton, Lima, and Toledo cite a number of historical statutes regulating the clear dangers presented by firearms and alcohol. For example, they point to a law from 1677 that imposed a fine on anyone that "shoot[s] any guns at drinking." Act of March 10, 1655, 1655 Va.Laws 401. They point to laws from four states passed within years of the ratification of the Fourteenth Amendment that criminalized carrying a gun while drunk. *See* 1868 Kan.Sess.Laws 378; 1883 Mo.Laws 76; 1883 Wis.Sess.Laws, volume 1, 290; 1909 Idaho Sess.Laws 6, Section 1. They also point to state laws designed to prevent intoxicated people from obtaining guns in the first place by making the sale of guns to an intoxicated person illegal. *See* 1878 Miss.Laws 175-176; 1911 Del.Laws 28, Section 3. Overall, the state and its amici curiae cities argue that these laws show that carrying or using a firearm while intoxicated is not a protected activity and does not fall within the original understanding of the right to bear arms.

---

2. The opinion concurring in judgment only asserts that a majority of this court adopts the originalist approach it takes in this case, and therefore, it is the approach to be taken by Ohio courts in Second Amendment cases going forward. That is not correct. The two-step test we apply in this opinion is supported by three justices. As explained below, the dissenting opinion declines to reach a conclusion using the originalist approach to evaluate the court of appeals' judgment or the proposition of law presented. Thus, it cannot be considered to be part of any holding of this court and has no controlling effect.

{¶ 21} Weber argues that R.C. 2923.15 does place a burden on activity protected by the Second Amendment, pointing to the holding of *Heller* as support. But Weber does not provide any developed argument addressing *Heller*'s recognition that the right to bear arms is not unlimited. Specifically, Weber's merits brief is only six pages long, and he presents no historical evidence and no discussion of how the original understanding of the right to bear arms relates to this case. This is significant because the complete ban on handgun possession in the home that was at issue in *Heller* is very different from the very limited ban in R.C. 2923.15, which prohibits only carrying or using a firearm while intoxicated. Weber simply does not address whether the statute falls within the original understanding of the right to bear arms.

{¶ 22} Although there may be good reason to find that Weber's challenge to R.C. 2923.15 fails at step one, the absence of any developed argument by Weber on that issue makes it difficult for this court to reach a firm conclusion. Nonetheless, we see no real need to decide this case solely on step one because, as we explain below, Weber's challenge fails under step two. We therefore take the approach of several other courts and continue the analysis, assuming arguendo for this matter, that step one does not result in the conclusion that R.C. 2923.15 regulates conduct outside the scope of the Second Amendment. *See Stimmel*, 879 F.3d at 205 (proceeding past step one by assuming, without deciding, that the Second Amendment applied to the law at issue); *Chovan*, 735 F.3d at 1137 (same); *United States v. Staten*, 666 F.3d 154, 160-161 (4th Cir.2011) (same).

2. *Step two: is R.C. 2923.15 unconstitutional based on the application of heightened means-end scrutiny?*

**a. The constitutionality of R.C. 2923.15 should be judged using intermediate scrutiny**

{¶ 23} Weber argues that R.C. 2923.15 should be judged under the strict-scrutiny standard because the right to bear arms is a fundamental right. He points

to our statement in *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 39, that "[i]f the challenged legislation impinges upon a fundamental constitutional right, courts must review the statutes under the strict-scrutiny standard."

{¶ 24} We are not persuaded by this argument. *Harrold* did not involve a Second Amendment challenge to a firearm regulation. It involved a parent's claim that Ohio's nonparental-visitation statutes "unconstitutionally infringe on a parent's fundamental right to make decisions concerning the care, custody, and control of his or her child," *id.* at ¶ 13, a right that is protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution, *id.* at ¶ 40, citing *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 372, 696 N.E.2d 201 (1998). As the Sixth Circuit has observed, however, "the ' "risk inherent in firearms" ' distinguishes the right to keep and bear arms ' "from other fundamental rights that have been held to be evaluated under a strict scrutiny test." ' " *Stimmel*, 879 F.3d at 206, quoting *Tyler*, 837 F.3d at 691 (lead opinion), quoting *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir.2015).

{¶ 25} Weber also appears to argue that strict scrutiny is warranted in this as-applied challenge because he was in his home at the time he carried the shotgun while intoxicated and the home is a place where the Second Amendment's protections are at their highest. We disagree.

{¶ 26} It is no doubt true that the core protection of the Second Amendment at issue here is "the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*." (Emphasis added.) *Heller,* 554 U.S. at 635, 128 S.Ct. 2783, 171 L.Ed.2d 637. But identifying that as the core of the Second Amendment right is the *beginning* of the inquiry at this point, not the end. As noted above, the level of scrutiny is determined based on how close a particular law comes to the core Second Amendment right and whether it imposes a severe burden on that right. A

court should apply intermediate scrutiny if the challenged law either does not come close to the core of the right or imposes only a slight burden on the right. But if the law imposes a severe burden on the core of the Second Amendment, it should be judged using strict scrutiny.

{¶ 27} R.C. 2923.15 does not come close to the core of the right and imposes, at most, only a slight burden on Weber's Second Amendment right. The reason is plain: intoxication impairs cognitive functions and motor skills, so an intoxicated person who attempts to carry or use a gun in an otherwise lawful manner is less likely to be able to do so safely and effectively and instead presents a greater risk of harm to innocent persons in the area as well as himself or herself. By applying only to persons who are "under the influence of alcohol or any drug of abuse," R.C. 2923.15 therefore regulates only the conduct of a person whose ability to carry or use a gun safely and effectively has already been undermined because of intoxication.

{¶ 28} The facts of this case establish a high level of intoxication. According to the deputies who arrived at his house, Weber was visibly "very" and "highly" intoxicated, smelled of alcohol, and spoke with slurred speech. He also had bloodshot and glassy eyes, was swaying from side to side, and could not even follow the directions given to him for a field sobriety test. It cannot reasonably be denied that Weber's choice to drink until he was so highly intoxicated had a detrimental impact on his ability to engage in self-defense, had it been necessary for him to do so, and that impact is what brings him within the scope of R.C. 2923.15.

{¶ 29} R.C. 2923.15 is also *very* limited in its application. The statute does not prevent someone who consumes alcohol from *owning* a gun, nor does it prohibit a gun from being *in* a house or provide that a gun must be rendered inoperable if someone in the house is intoxicated. The statute also leaves persons who consume alcohol free to carry and use a gun in the home for self-defense when they are not

intoxicated. In fact, the law does not even apply to a person carrying or using a gun while consuming alcohol—as long as the person is not intoxicated. (As discussed later in this opinion, major gun manufacturers and the National Rifle Association agree that it is unsafe to carry or use a gun while having even a single drink of alcohol.) Overall, R.C. 2923.15 is a targeted restriction that prohibits a narrow range of conduct (carrying or using a gun) for a very limited period of time (while someone is in a state of intoxication) due to the inherently dangerous nature of carrying or using a gun while in that state.

{¶ 30} We also find it relevant that numerous courts have applied intermediate scrutiny to regulations on guns—lifetime prohibitions on certain individuals possessing a gun—that are far broader and more burdensome than is R.C. 2923.15. *See, e.g.*, *Stimmel*, 879 F.3d at 206 (applying intermediate scrutiny to a complete prohibition on gun possession by individuals previously convicted of a misdemeanor crime of domestic violence); *Tyler*, 837 F.3d at 690-693 (lead opinion) (same as to a complete prohibition on gun possession by certain individuals suffering from mental illness); *Yancey*, 621 F.3d at 683 (applying intermediate scrutiny to a complete prohibition on gun possession by a person who is "an unlawful user of or addicted to any controlled substance"); *United States v. Williams*, 616 F.3d 685, 692-693 (7th Cir.2010) (applying intermediate scrutiny to complete prohibition on gun possession by convicted felons). The scope of R.C. 2923.15 pales in comparison to these lifetime prohibitions. In this light, the burden placed on Second Amendment rights by R.C. 2923.15 is, at most, only very slight.

### b. R.C. 2923.15 is constitutional under intermediate scrutiny

{¶ 31} Under intermediate scrutiny, a statute is constitutional so long as it furthers an important governmental interest and does so by means that are substantially related to that interest. *Chester*, 628 F.3d at 683. R.C. 2923.15 passes this test.

{¶ 32} Weber argues that R.C. 2923.15 does not survive intermediate scrutiny and cites *Heller*, 554 U.S. at 628, 128 S.Ct. 2783, 171 L.Ed.2d 637, for the proposition that the need to have a firearm for self-defense is most acute in the home. The state, by contrast, argues that the statute furthers the government's legitimate interest in protecting people from harm from the combination of firearms and alcohol.

{¶ 33} We agree with the state that R.C. 2923.15 furthers this important governmental interest. When an intoxicated person carries or uses a gun, either at home or outside the home, the impairment of cognitive functions and motor skills can result in harm to anyone around the intoxicated person and even to the intoxicated person himself or herself.

{¶ 34} The facts here create a case in point in which such harm might have occurred. Weber picked up a shotgun while heavily intoxicated, which caused his wife to call 9-1-1. Whether due to Weber's reduced inhibitions or impaired motor skills, Weber's wife perceived a great enough risk to herself or to Weber to make an emergency call. That risk was then extended to the two deputies who rushed to the scene at 4:00 a.m., knowing only that an intoxicated man had a gun and that his wife needed their help.

{¶ 35} It is also not hard to imagine other examples of the kind of harm the General Assembly has an interest in preventing:

- an intentional shooting of a friend, coworker, police officer, or other innocent person due to reduced inhibitions, impulsivity, or a mood change caused by intoxication;

- a suicide facilitated by reduced inhibitions, impulsivity, or a depressed mood caused by intoxication;

- an accidental shooting by an intoxicated person handling a gun who incorrectly believes the gun is unloaded, or who accidentally pulls the trigger, due to impaired cognitive functions or motor skills caused by intoxication;

- an accidental shooting involving a person who mistakes a loved one arriving home for an intruder due to impaired cognitive functions caused by intoxication; and

- a shooting by a police officer of an intoxicated person who accidentally or intentionally points a gun at the officer due to impaired cognitive functions or motor skills caused by intoxication.

Each of these examples has happened in a home with tragic results.

{¶ 36} The bases for the government's interest are more than merely anecdotal, as amici curiae Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence point out. Research shows that "people who abuse alcohol or illicit drugs are at an increased risk of committing acts of violence." Webster & Vernick, *Keeping Firearms from Drug and Alcohol Abusers*, 15 Injury Prevention 425 (2009). The victims of such violence are often a gun owner's family members or the gun owner himself. For example, "[d]rug and alcohol use by domestic abusers has been strongly linked with the perpetration of fatal and non-fatal domestic violence." *Id.* at 425. "[A]n overwhelming proportion (70%) of [intimate-partner] homicide perpetrators were under the influence of substances when the crime occurred, * * * and the use of alcohol is a strong predictor of intimate terrorism of women." Darryl W. Roberts, *Intimate Partner Homicide: Relationships to Alcohol and Firearms*, 25 J.Contemp.Crim.Just. 67, 70 (2009). Studies show that there is a strong correlation between heavy drinking and self-inflicted injury, including suicide, from a firearm. *See* Branas, Han & Wiebe, *Alcohol Use and Firearm Violence*, 38 Epidemiologic Reviews 32, 36 (2016). The amici curiae cities also point out in their brief that "[f]or men, deaths from alcohol-related firearm violence equal those from alcohol-related motor vehicle crashes." Garen Wintemute, *Alcohol Misuse, Firearm Violence Perpetration, and Public Policy in the United States*, 79 Preventive Medicine 15 (2015).

{¶ 37} Even Remington Arms, a gun manufacturer that has been in business for over 200 years, embraces the concern as part of its Ten Commandments of Firearm Safety: "Alcohol, drugs and guns are a deadly combination. * * * A staggering percentage of the shooting accidents that occur every year involve alcohol or drugs." Remington Arms Company, Ten Commandments of Firearm Safety, available at https://www.remington.com/support/safety-center/ten-commandments-firearm-safety (accessed Sept. 25, 2020) [https://perma.cc/NCD7-TDWB].

{¶ 38} Courts have also long recognized a state's legitimate interest in preventing those impaired by alcohol or by drugs from using guns. *See State v. Waterhouse*, 7th Dist. Belmont No. 93-B-26, 1995 WL 70125, *2 (Feb. 16, 1995); *People v. Wilder*, 307 Mich.App. 546, 561, 861 N.W.2d 645 (2014); *Gibson v. State*, 930 P.2d 1300, 1302 (Alaska App.1997); *Roberge v. United States*, E.D.Tenn. Nos. 1:04-cr-70 and 1:10-cv-273, 2013 WL 4052926, *18 (Aug.12, 2013).

{¶ 39} R.C. 2923.15 therefore seeks to further the government's important interest in using its police power to prevent the harm that can arise from the combination of guns and alcohol. And the means chosen here are substantially related to the government's interest in preventing this harm. As explained above, R.C. 2923.15 targets the governmental interest directly, applying only to individuals who are intoxicated. It is difficult to understand how the government could have attempted to further that interest in any other viable manner.

{¶ 40} We also reject Weber's argument that the governmental interest in preventing harm from the combination of guns and alcohol is lower with respect to conduct occurring inside a home because the need for a gun for self-defense is most acute in the home. "The danger to innocent persons is the same whether the intoxicated person is inside his home or in a public place." *Waterhouse* at *2. This argument also confuses the governmental-interest inquiry with the burden inquiry.

We already considered the centrality of the home to the Second Amendment when deciding what level of scrutiny to apply, and that decision affected how strong of a governmental interest the state is required to show.  If the law burdened the core of the right—self-defense *in the home*—or otherwise imposed a severe burden on the right, we would apply strict scrutiny and require the state to show that the law furthers a compelling governmental interest.  But because we find only a slight burden at best, the law requires the state to meet a *lower* standard: an important governmental interest.  There is simply no basis for finding that the governmental interest here is less strong because it regulates conduct in the home when that governmental interest is being furthered through a statute that regulates only the conduct of persons whose ability to engage in self-defense in the home has been diminished by their decision to become intoxicated.

{¶ 41} To the extent that Weber's argument is based on a more general notion that the home is a private place and the government therefore has less of an interest in regulating what people do there, we reject that argument too.  We cannot consider the conduct regulated by R.C. 2923.15 in some *general* sense.  R.C. 2923.15 regulates conduct that is *inherently dangerous*, and the governmental interest in preventing harm from *that* conduct is strong, regardless whether the government has an interest in regulating conduct in a home that is not dangerous and outside the scope of R.C. 2923.15.

{¶ 42} We similarly reject the contention that because R.C. 2923.15 regulates conduct inside a home, it does not further the governmental interest in a way that is substantially related to that interest.  An intoxicated person's home is often also the home of that person's spouse and children and, as discussed above, those persons are often the victims of violence because of the combination of guns and alcohol.  Applying R.C. 2923.15 to activity within a home is therefore essential for the General Assembly to protect family members, public servants, and others from the harm that arises when guns and alcohol mix.  As noted above, the statute

16

is also extremely limited in how it applies in the home, leaving Weber free to have a gun in his home at all times and to carry that gun in his home once his cognitive abilities and motor skills return to normal and he no longer presents a risk of harm to others and himself.

{¶ 43} The fact that R.C. 2923.15 applies to unloaded guns also does not impact its constitutionality, as there is still a clear risk of harm from permitting an intoxicated person to carry an unloaded gun. If an intoxicated person decides to shoot someone due to reduced inhibitions or a mood change, the need to load the gun first may not impose a meaningful practical barrier. Second, making a distinction between loaded and unloaded guns for purposes of R.C. 2923.15 presumes that an intoxicated person can be expected to accurately determine whether a gun is unloaded. Given the impairment of cognitive functions and motor skills caused by intoxication, however, the General Assembly can reasonably decide not to rely on that expectation to keep others in the house safe. In other words, intoxicated persons may believe a gun is unloaded when, in fact, it is not, which can lead to unintended shootings. Tragically, this is confirmed by news reports of accidental shootings in which the shooter later states that he or she thought the gun was unloaded. Including unloaded guns within the scope of R.C. 2923.15 therefore furthers the government's important interest in preventing harm from the combination of guns and alcohol through means that are substantially related to that interest.

{¶ 44} This conclusion is not changed by the facts that Weber's shotgun was unloaded when the deputies arrived and no harm was caused to anyone in this particular case. First, Shouse testified that Weber told him he was unloading the shotgun to wipe it down, and Weber confirms this statement in his brief. This indicates that Weber's shotgun *was* loaded when he first picked it up. Such conduct is plainly dangerous. Second, the fact that Weber may have unloaded the shotgun while intoxicated without shooting anyone in this particular case does not diminish

the General Assembly's important interest in preventing harm through R.C. 2923.15. *See Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 468, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (holding that "the absence of explicit proof or findings of harm or injury [in the case before the court] is immaterial" when the government has an interest in a prophylactic rule designed to prevent harm before it occurs); *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 430-431, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1983), citing *Ward v. Rock Against Racism*, 491 U.S. 781, 801, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("we judge the validity of the restriction in this [as-applied challenge] by the relation it bears to the general problem * * * not by the extent to which it furthers the Government's interest in an individual case").

{¶ 45} We also note that courts upholding far broader and more burdensome laws—lifetime prohibitions on certain individuals possessing guns—have not found that it made a difference that the laws were applied in the home or to unloaded guns. *See, e.g.*, *Stimmel*, 879 F.3d at 206 (upholding complete prohibition on gun possession by individuals previously convicted of a misdemeanor crime of domestic violence); *Yancey*, 621 F.3d at 683 (upholding complete prohibition on gun possession by a person who is "an unlawful user of or addicted to any controlled substance"); *Williams*, 616 F.3d at 692-693 (upholding complete prohibition on gun possession by convicted felons).

{¶ 46} Finally, major American gun manufacturers and the National Rifle Association agree that it is unsafe to carry a gun while intoxicated, and they do not make any distinction based on whether one is at home or the gun is unloaded. *See* Sturm, Ruger & Company, Basic Safety Rules ("Avoid alcoholic beverages or drugs when shooting or handling a gun"), available at https://www.ruger.com/safety/basicSafetyRules.html (accessed Sept. 25, 2020) [https://perma.cc/82N9-4TFZ]; Remington Arms Company, at First Commandment ("Treat every gun as if it were loaded"), available at

https://www.remington.com/support/safety-center/ten-commandments-firearm-safety (accessed Sept. 25, 2020) [https://perma.cc/NCD7-TDWB]; Browning, *Firearms Safety Depends on You* at 2 ("Alcohol * * * & guns don't mix"), available at https://www.browning.com/content/dam/browning/support/safety-recall/FSDOY.pdf (accessed Sept. 25, 2020) [https://perma.cc/L5TY-TXUB]; Springfield Armory, Safety Information ("Never use alcohol * * * when handling a gun. Alcohol and other substances can impair mental and physical bodily functions, including reaction time and judgment, and should not be used before or during the handling of firearms"), available at https://www.springfield-armory.com/intel/safety-information/ (accessed Sept. 25, 2020) [https://perma.cc/73B2-KXE8]; National Rifle Association, NRA Gun Safety Rules ("Alcohol, as well as any other substance likely to impair normal mental or physical bodily functions, must not be used before or while handling or shooting guns"), available at https://gunsafetyrules.nra.org/ (accessed Sept. 25, 2020) [https://perma.cc/9ZQN-5QSA].

{¶ 47} R.C. 2923.15 is valid under the intermediate-scrutiny test; the statute does not violate the Second Amendment.

### C. The constitutionality of R.C. 2923.15 under the Ohio Constitution

{¶ 48} Weber states in passing that R.C. 2923.15 also violates Article I, Section 4 of the Ohio Constitution, which provides, "The people have the right to bear arms for their defense and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be kept up; and the military shall be in strict subordination to the civil power." But Weber makes no attempt to discuss how this provision differs from the Second Amendment. He does not discuss the text or history of Article I, Section 4, nor does he discuss this court's precedent on that provision or otherwise argue why that provision protects his conduct in this case beyond the Second Amendment. We therefore decline to address whether R.C. 2923.15 violates Article I, Section 4 of the Ohio Constitution. *See Mason City*

*School Dist. Bd. of Edn. v. Warren Cty. Bd. of Revision*, 138 Ohio St.3d 153, 2014-Ohio-104, 4 N.E.3d 1027, ¶ 38.

## IV.  THE DISSENTING OPINION

**{¶ 49}** The dissenting opinion argues that we should reverse the judgment of the Twelfth District Court of Appeals and remand the matter for further proceedings on the ground that the court of appeals reviewed Weber's argument using what the dissenting opinion believes is the wrong test.  That approach is plainly wrong.  We review judgments, not reasons.  *State v. Lozier*, 101 Ohio St.3d 161, 2004-Ohio-732, 803 N.E.2d 770, ¶ 46 ("A reviewing court is not authorized to reverse a correct judgment merely because it was reached for the wrong reason"); *Agricultural Ins. Co. v. Constantine*, 144 Ohio St. 275, 284, 58 N.E.2d 658 (1944) (same).  This is not a controversial principle: we recognized it as early as 1846.  *See Harman v. Kelley*, 14 Ohio 502, 507 (1846).  The United States Supreme Court recognized it at least a quarter of a century before that.  *See McClung v. Silliman*, 19 U.S. 598, 603, 5 L.Ed. 340 (1821) ("The question before an appellate Court is, was the *judgment* correct, not the *ground* on which the judgment professes to proceed" [emphasis sic]). For this reason, nothing in the dissenting opinion can be considered to be part of any holding of this court.  It has no controlling effect.  At most, it signals how the dissenting justices might view the next case that presents a Second Amendment challenge.  But it does not establish legal precedent.

**{¶ 50}** It is also clear that the dissenting opinion would simply give Weber a second bite of the apple.  Although it states that it is simply trying to be fair by "[g]iving *the parties* the chance to brief and argue" the appropriate test for Second Amendment cases (emphasis added), dissenting opinion at ¶ 125, the parties *did* have the chance to address the issue.  The court of appeals clearly discussed the relevant law, including the different tests that have been applied nationally since *Heller*, and the state thoroughly briefed the issue before us.  Two amici curiae in support of the state thoroughly briefed the issue as well.  But Weber did not.  He

argued only that we should decide this case based on the basic holding of *Heller* or after applying strict scrutiny.

{¶ 51} The dissenting opinion also states that "it is worth reminding *both parties* that * * * *each side* would need to marshal significant historical evidence in support of their understanding of the Second Amendment." (Emphasis added.) Dissenting opinion at ¶ 126. But again, the state and amici curiae *did* provide a substantial amount of historical material in support of their argument that the court of appeals' judgment was correct under the text-history-and-tradition approach preferred by the dissenting opinion. Weber presented no such argument.

{¶ 52} There is, therefore, no reason for the dissenting opinion to give Weber a second chance to argue this case. And it would be particularly improper to do that while simultaneously giving him instructions on how he should argue the case the second time around, as the dissenting opinion does. The dissenting opinion even preemptively labels certain statements in *Heller* as dicta, apparently oblivious to the fact that doing so without addressing the correctness of the court of appeals' judgment is itself dicta.

{¶ 53} Lastly, the dissenting opinion does not really explain what it means to judge R.C. 2923.15 by the "text, history, and tradition" of the Second Amendment. What should a court do when those do not provide a clear answer? If the Twelfth District reviewed this case again and found the historical record unclear, would we not be right back where we started?

{¶ 54} More generally, how would the dissenting opinion address the concern that historical evidence can be viewed in different ways by different people? How would it deal with an argument that changed circumstances make reliance on certain Framing Era practices unjustified? Would it reject that notion reflexively on the ground that modern concerns are wholly irrelevant under the text-history-and-tradition-based approach? Or does it acknowledge that present-day judgments have a role to play?

{¶ 55} The dissenting opinion provides no guidance on these important questions, and there are many more such questions. (Does one simply look for an historical analogue to the law at issue? And if analogues exist, how widespread must they be? How does one deal with modern technologies and circumstances that did not exist at the time of the Founding? We could go on.) The dissenting opinion would simply give Weber a second change to litigate his claim, with guidance on how to win. Nothing about the dissenting opinion reflects a principled approach to deciding this case.

## V. CONCLUSION

{¶ 56} For the reasons explained above, we affirm the judgment of the Twelfth District Court of Appeals.

Judgment affirmed.

DONNELLY and STEWART, JJ., concur.

DEWINE, J., concurs in judgment only, with an opinion.

FISCHER, J., dissents, with an opinion joined by KENNEDY and FRENCH, JJ.

_____

**DEWINE, J., concurring in judgment only.**

{¶ 57} The question presented in this case is whether there is a constitutional right to be drunk and handle a firearm. Or, can the government say: *you're allowed to be drunk and you have a right to handle a firearm—you just can't do both at the same time*. Based on the original understanding of the Second Amendment, the answer is the latter. So I concur in the judgment. But because I believe the lead opinion's mode of analysis fails to provide adequate protection for the right to bear arms, I concur in judgment only.

## I. The Lead Opinion Fails to Follow the Analytical Framework Established by the United States Supreme Court in *Heller v. United States*

{¶ 58} The text of the Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to

keep and bear Arms, shall not be infringed." The Ohio Constitution has a similar provision: "The people have the right to bear arms for their defense and security * * *." Ohio Constitution, Article I, Section 4. Because Weber bases his arguments on the Second Amendment, and because the lead opinion analyzes the right under the Second Amendment, I too will limit my focus to the federal guarantee.

### A. In Heller, the United States Supreme Court Looked to Text, History, and Tradition to Determine the Scope of the Right

{¶ 59} In *District of Columbia v. Heller*, the Supreme Court held that "on the basis of both text and history," the Second Amendment confers "an individual right to keep and bear arms." 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). The amendment is "widely understood to codify a pre-existing right, rather than to a fashion a new one." *Id*. at 603. In assessing the scope of the right, the court began with the text of the amendment and considered how its words would have been understood at the time of its ratification. *Id*. at 576-592. But the court's inquiry was not limited to linguistics. Instead, it drew on history and tradition to illuminate the purview of the right. The sources relied upon by the court can be grouped into three areas.

{¶ 60} First, the court looked to English history and the Declaration of Rights of 1689. *Id*. at 593-595. Second, the court examined contemporary sources from the time of the founding. These included arguments made during the ratification debates, *id*. at 598-599, state constitutional provisions in the period between independence and the ratification of the Bill of Rights, *id*. at 601-602, and "Second Amendment analogues" adopted in nine states between 1789 and 1820, *id*. at 602-604. Third, the court considered "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *Id.* at 605. In doing so, the court identified four distinct areas of inquiry: "postratification commentary," *id.* at 605-606, pre–Civil War case law, *id.* at 610-614, post–Civil War legislation, *id.* at 613-616, and "post–Civil War

commentators," *id*. at 616-619. Though acknowledging that the post–Civil-War sources "do not provide as much insight into [the Second Amendment's] original meaning as earlier sources," the court still found "their understanding of the origins and continuing significance of the Amendment [to be] instructive." *Id.* at 614.

{¶ 61} Based on its survey of text, history, and tradition, the court concluded that the Second Amendment guaranteed an individual's right to bear arms and that the Washington, D.C., handgun ordinance at issue in the case infringed upon the right. *Id*. at 592, 628-629. The court also explained that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id*. at 626. Thus, it made clear that its "opinion should [not] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626-627. It further explained that "these presumptively lawful regulatory measures" were simply examples; the "list does not purport to be exhaustive." *Id*. at 627, fn. 26. The court didn't elaborate on the historical reasons for these limitations on the right but rather noted that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id*. at 635.

{¶ 62} Subsequently, in *McDonald v. Chicago*, the Supreme Court applied the same text-history-and-tradition approach to a Chicago firearms ban. 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). It held that the Second Amendment right applied against the states through the Fourteenth Amendment because "the right to keep and bear arms is * * * fundamental * * * to our scheme of ordered liberty." *Id*. at 778. The court also repeated the assurances made in *Heller* that its holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.' " *Id*. at 786, quoting *Heller*, 554 U.S. at 626, 128 S.Ct. 2783, 171 L.Ed.2d 637.

24

### B. *The Lead Opinion Improperly Applies Intermediate Scrutiny*

{¶ 63} The lead opinion begins by discussing the Supreme Court's decision in *Heller*. But rather than follow the lead of *Heller* and decide this case by using text, history, and tradition, it opts to apply a two-step test. In the first step, the lead opinion asks whether the restriction places a burden on activity within the Second Amendment. Lead opinion at ¶ 20-22. It then "assume[s] arguendo" that the regulated conduct is not outside the Second Amendment protection and proceeds to apply an interest-balancing test by which R.C. 2923.15 is subjected to intermediate scrutiny. *Id*. at ¶ 22. Under this test, "the statute is constitutional so long as it furthers an important governmental interest and does so by means that are substantially related to that interest." *Id.* at ¶ 16, citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir.2010).

{¶ 64} In my view, the intermediate-scrutiny test employed by the lead opinion is inconsistent with *Heller* and *McDonald* and insufficiently protective of the Second Amendment right. In *Heller*, the Supreme Court chose to forego employing an interest-balancing approach and instead looked to text, history, and tradition to determine whether the District of Columbia handgun statute infringed upon the Second Amendment right. *Heller* at 634-635. Notably, in his dissent in *Heller*, Justice Breyer proposed an interest-balancing test that looks a lot like what the lead opinion uses today, asking "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id*. at 689-690 (Breyer, J., dissenting). The *Heller* majority explicitly rejected this suggestion, pointing out that the amendment itself was the product of interest balancing:

The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth*

insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. * * * The Second Amendment * * * is the very *product* of an interest balancing by the people—which Justice Breyer would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

(Emphasis sic.) *Id*. at 634-635.

{¶ 65} There can be little question that the court meant what it said about interest balancing in *Heller* because it made the same point in *McDonald*: "Municipal respondents assert that [state-constitution protections of firearm rights] are subject to 'interest balancing' and [state courts] have sustained a variety of restrictions. * * * In *Heller*, however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." *McDonald*, 561 U.S. at 785, 130 S.Ct. 3020, 177 L.Ed.2d 894, citing *Heller*, 554 U.S. at 633-635, 128 S.Ct. 2783, 171 L.Ed.2d 637.

{¶ 66} It is true that in *Heller*, the court said that the D.C. ban would be unconstitutional under any of the traditional standards of scrutiny. *Heller* at 628-629. And it is also true that in the years since *Heller*, many federal circuit courts have adopted a test similar to that employed by the lead opinion with intermediate scrutiny applied at the second step. *See* lead opinion at ¶ 13-17 (collecting cases). But read in context, the Supreme Court's comment in *Heller* "was more of a gilding-the-lily observation about the extreme nature of D.C's law—and appears to

have been a pointed comment that the dissenters should have found D.C.'s law unconstitutional even under their own suggested balancing approach—than a statement that courts may or should apply strict or intermediate scrutiny in Second Amendment cases." *Heller v. District of Columbia*, 670 F.3d 1244, 1277-1278 (D.C.Cir.2011) ("*Heller II*") (Kavanaugh, J., dissenting). And the adoption of the two-pronged approach by federal courts seems to result more from a reflexive resort to familiar standards than from a faithful reading of *Heller* and *McDonald*.

**{¶ 67}** The disconnect between *Heller* and the approach used by these federal courts (and the lead opinion today) has not gone unnoticed by members of the United States Supreme Court. Justice Thomas, in a dissent joined by Justice Kavanagh, has complained that "many courts have resisted our decision in *Heller* and *McDonald*" and "[i]nstead of following the guidance provided in *Heller*" have "self-created" an analytical vacuum that they have filled with a two-step test that "incorporates tiers of scrutiny on a sliding scale." *Rogers v. Grewal*, ___ U.S. ___, ___, 140 S.Ct. 1865, 1866, 207 L. Ed. 2d 1059 (2020) (Thomas, J. dissenting to the denial of certiorari). And, dissenting in a case dismissed as moot earlier this year, Justice Alito—joined by Justices Thomas and Gorsuch—explained the disputed regulation should have been assessed under the *Heller* framework, using history and tradition to ascertain "the scope of the right to keep and bear arms as it was understood at the time of the adoption of the Second Amendment." *New York State Rifle & Pistol Assn., Inc. v. New York*, ___ U.S. ___, ___, 140 S.Ct. 1525, 1540, 206 L.Ed.2d 798, (Alito, J., dissenting), citing *Heller* at 577-605, 628-629. Justice Kavanaugh concurred with the majority that the case was moot but wrote separately to explain that he agreed "with Justice Alito's general analysis of *Heller* and *McDonald*" and "share[d] Justice Alito's concern that some federal and state courts may not be properly applying *Heller* and *McDonald*." *Id*. at ___, 140 S.Ct. at 1527.

**{¶ 68}** In the same vein, a number of federal jurists have argued persuasively for application of the text-history-tradition approach employed by

*Heller* rather than an interest-balancing test. *See, e.g.*, *Heller II* at 1271 (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny"); *Tyler v. Hillsdale Cty. Sheriff's Dept.*, 837 F.3d 678, 703-704 (6th Cir.2016) ("*Tyler II*") (Batchelder, J., concurring in part), quoting *Heller* at 634 ("in embracing an approach largely divorced from the text, history, and tradition of the Second Amendment, I fear that we are well on our way to doing what *Heller* and, more importantly, the People who ratified the Second Amendment, forbade: 'decid[ing] on a case-by-case basis whether the right is *really worth* insisting upon' " [emphasis in *Heller* and brackets added in *Tyler II*]).

{¶ 69} Thus, rather than jump to a balancing test, we should look at text, history, and tradition. If the government regulation burdens conduct that was not understood to fall within the scope of the right, then the Second Amendment is not implicated. On the other hand, if a regulation wholly proscribes the core right to bear arms, it violates the Constitution. This is the case no matter how compelling the purported governmental interest. *Heller*, 554 U.S. at 634-636, 128 S.Ct. 2783, 171 L.Ed.2d 637. A city, for example, might decide to pass legislation banning handguns. In support, it might proffer a wealth of statistics and sociological studies to show that the city's handgun ban is absolutely necessary to prevent gun violence. Confronting such a claim, a court need not sift through this evidence and ask whether more narrowly tailored ways would achieve the compelling government interest of reducing gun violence. Such an inquiry is unnecessary because the Second Amendment has taken the question off the table.

{¶ 70} So rarely, if ever, will we need to resort to an interest-balancing test to resolve a Second Amendment challenge. But to the extent that we ever find a question that cannot be answered based on text, history, and tradition, intermediate scrutiny is not the appropriate test. There is no question that the Second

Amendment guarantee of a personal right to own a firearm is a "fundamental right[] necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778, 130 S.Ct. 3020, 177 L.Ed.2d 894. Nor is it disputed that this right is one that is " 'deeply rooted in this Nation's history and tradition.' " *Id*. at 767, quoting *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). In most contexts, we subject governmental regulations that infringe on fundamental rights to strict scrutiny. *See, e.g., Glucksberg* at 720-721 (strict scrutiny applies to "fundamental" liberty interests); *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 39 (same). The framers certainly did not believe the Second Amendment was any less important than any of the other original amendments. *See McDonald* at 789 (rejecting the notion that the right to bear arms should be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees"). As the Supreme Court explained in *Heller* and *McDonald*, the right was well ingrained at the founding with four states having adopted Second Amendment analogues before ratification and nine more states (including Ohio) adopting state constitutional provisions protecting the right to bear arms between 1789 and 1820. *McDonald* at 769, citing *Heller* at 600-603. For good reason, Joseph Story in his Commentaries on the Constitution of the United States identified " '[t]he right of the citizens to keep, and bear arms' " as " 'the palladium of the liberties of a republic.' " *Id*. at 769-770, quoting 3 Story, *Commentaries on the Constitution of the United States*, Section 1890, at 746 (1833).

{¶ 71} Thus, I would apply the analytical framework endorsed by the *Heller* court and decide Weber's claim that his Second Amendment rights have been violated based upon the text, history, and tradition of the Second Amendment. The three dissenting members of this court take the same approach. *See* dissent at ¶ 111. Because a majority of the court today adopts this approach, going forward, lower courts in Ohio should follow the analytical framework used by the Supreme Court

in *Heller* and assess Second Amendment claims based upon text, history, and tradition.

## II. Weber Challenges R.C. 2923.15(A) as Applied to Him

{¶ 72} Weber advances an "as applied" challenge. That is, he does not contend that the law is unconstitutional as written but rather that its application to him " 'in the particular context in which he has acted' " is unconstitutional. *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512, ¶ 17, quoting *Ada v. Guam Soc. of Obstetricians & Gynecologists*, 506 U.S. 1011, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting to the denial of certiorari). The salient facts are (1) that Weber was highly intoxicated, (2) that he was in his home with his wife, (3) that he was physically handling his firearm, (4) that while intoxicated Weber unloaded his weapon, and (5) that out of an apparent concern for her own safety, Weber's wife, sometime around 4:00 a.m., called 9-1-1 to summon law enforcement to the house. The question is whether under these facts Weber suffered a deprivation of a constitutional right.

{¶ 73} Even though Weber says that he is challenging the statute as applied, he repeatedly raises arguments that either are based on erroneous assumptions or relate to other hypothetical situations. For example, he says, "every person who is in their home and has a firearm in the home while (or after) consuming alcohol may be charged under the statute." If that statement were true, I would likely agree that the statute was unconstitutional, at least as applied to someone who was prosecuted for simply having a weapon in the house while intoxicated. But it is not true. The statute under which Weber was prosecuted only makes it crime to "carry or use" a firearm while intoxicated, something Weber was plainly doing. R.C. 2923.15.

{¶ 74} Weber also contends that the statute conflicts with the castle doctrine and maintains that this case involves one's right to use a weapon in their home for purposes of self-defense. That's not correct either. This is not a case in which the government has prosecuted someone who, while inebriated, resorted to using a

weapon in self-defense. Again, if that were the case, I would likely agree that the law was unconstitutional in that particular application. But that is not the case in front of us. Furthermore, Weber's home wasn't just his castle, it was also his wife's castle. And the reason the police came to their home was because she summoned them.

{¶ 75} Nor do I understand Weber's emphatic claim that this is a case dealing solely with the handling of an unloaded weapon. Weber told the deputy who arrived on the scene that he was "unloading the firearm to wipe it down." Maybe I'm missing something, but I'm pretty sure that the only way someone can "unload" a weapon is for the weapon to have been loaded.

{¶ 76} Weber cannot challenge the statute by arguing that "it would be unconstitutional if applied to third parties in hypothetical situations." *Ulster Cty. Court v. Allen*, 442 U.S. 140, 1555, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979), citing *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The only thing that is relevant is whether the statute is unconstitutional in its particular application to Weber.

### III. Applying the *Heller* Framework to R.C. 2923.15

{¶ 77} The question after *Heller* and *McDonald* is whether R.C. 2923.15 falls within the category of "longstanding regulatory measures" that, like prohibitions on gun ownership by felons and the mentally ill, fall outside the Second Amendment's protection. *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020, 177 L.Ed.2d 894. As I will explain below, the weight of the evidence demonstrates that it does. First, the rationale that places someone who is currently mentally ill and unable to responsibly use a firearm outside the Second Amendment protection applies with equal force to someone who is intoxicated. Second, the best available evidence about the founding generation's understanding of the right to bear arms reveals that the right did not preclude restrictions on classes of people who presented a present danger to others. In addition, the founding generation closely

tied its conception of a right to the use of reason and understood that one with a reduced ability to reason could be incapable of exercising a right. Finally, a review of legal prohibitions involving guns and alcohol in 18th- and 19th-century America adds further support for the proposition that R.C. 2923.15, as applied to Weber, is not inconsistent with the Second Amendment.

### A. R.C. 2923.15 Is Consistent with Restrictions on Firearms Ownership by the Mentally Ill

{¶ 78} In *Heller*, the Supreme Court placed "longstanding prohibitions on the possession of firearms by felons and the mentally ill" outside the scope of the Second Amendment's protection. *Heller*, 554 U.S. at 626, 128 S.Ct. 2783, 171 L.Ed.2d 637. The dissent correctly notes that this language can be considered dicta. Dissenting opinion at ¶ 127. But the Supreme Court felt it sufficiently important to not only make this point in *Heller* but to reiterate it in *McDonald*. *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020, 177 L.Ed.2d 894. Thus, it must be considered in the historical analysis.

{¶ 79} Indeed, since *Heller*, there has been universal agreement that such restrictions are permissible under the Second Amendment. *See, e.g.*, *Tyler v. Hillsdale*, 775 F.3d 308, 321 (6th Cir.2014), *vacated on other grounds and reh'g en banc granted* Apr. 21, 2015 ("We need not reinvent the wheel and justify with historical reasoning [a] prohibition on possession of firearms by the mentally ill. * * * *Heller* has already sanctioned" this longstanding prohibition). The debate that has played out in the caselaw since *Heller* is not whether such restrictions are permissible but whether certain individuals—for example, nonviolent felons or those who previously suffered but do not currently suffer from a mental illness— may argue that such restrictions may not properly be applied to them. *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 442 (7th Cir.2019) (noting that "[r]elying on the 'presumptively lawful' language in *Heller* and *McDonald*, every federal court of appeals to address the issue has held that [18 U.S.C.] 922(g)(1)['s prohibition on

firearm ownership by a felon] does not violate the Second Amendment," but the "courts of appeals are split as to whether *as-applied*" challenges are available [emphasis sic]); *id.* at 454 (Barrett, J., dissenting) ("*Heller*'s reference endorses the proposition that the legislature can impose some categorical bans on the possession of firearms. * * * Our task is to determine whether *all* felons—violent and nonviolent alike—comprise one such category" [emphasis sic]); *Tyler II*, 837 F.3d at 680-681 (all 16 members of the en banc court agreeing that the government can restrict firearm ownership by someone who is currently mentally ill but disagreeing as to whether someone who had been committed 30 years earlier for a mental-health episode could be denied the right to own a firearm, despite being decades removed from the incident and currently having no mental-health problems).

{¶ 80} If the government can restrict gun ownership by someone who is currently mentally ill without running afoul of the Second Amendment, it would seem to also be the case that the government can restrict gun handling by someone who is intoxicated. One is hard-pressed to make any distinction between someone who is temporarily intoxicated and someone who is currently suffering from mental illness. In both cases, the person is unable to rationally exercise his right to bear arms and presents a danger to others. As one commentator explained, "there seems to be little reason to treat those who are briefly mentally infirm as a result of intoxication differently from those who are permanently mentally infirm as a result of illness or retardation." Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L.Rev. 1443, 1535 (2009).

{¶ 81} Indeed, the prohibition on gun handling by someone who is intoxicated is a much more limited restriction on the right than a restriction directed at the mentally ill. The ban is of a reduced duration: the drunk need only sober up to regain the ability to exercise the right. The ban is narrower in scope: under R.C. 2923.15, someone who is intoxicated isn't barred from owning a weapon or even

having constructive possession of one, he simply must wait until he sobers up to handle his firearm. And unlike someone who suffers from mental illness, one who is intoxicated has complete control of the firearms disability: if you want to handle your gun, just make sure you don't get drunk first. Indeed, R.C. 2923.15 doesn't prohibit someone from handling a gun at all, it just prohibits someone who chooses to handle a gun from being drunk.

{¶ 82} Also analogous to the restriction on handling a firearm while intoxicated is the federal ban on gun possession for someone "who is an unlawful user of or addicted to any controlled substance." *See* 18 U.S.C. 922(g)(3). Similar restrictions were unknown at the time of the founding, but applying *Heller*, courts have had little difficulty holding that such laws do not infringe upon conduct within the scope of the Second Amendment's protection. *See United States v. Yancey*, 621 F.3d 681, 683 (7th Cir.2010) (per curiam). As the Seventh Circuit explained, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id*. at 685. Further, such a restriction is "far less onerous than those affecting felons and the mentally ill," because "an unlawful drug user * * * could regain his right to possess a firearm simply by ending his drug abuse." *Id.* at 686-687.

{¶ 83} Weber's primary complaint is that R.C. 2923.15 was applied to his conduct inside his home. But restrictions on gun ownership by felons and the mentally ill also apply inside the home, as do prohibitions directed at habitual drug users. So it is hard to see how the fact that Weber was inside his home changes the analysis. Furthermore, *Heller* spoke of the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635, 128 S.Ct. 2783, 171 L.Ed.2d 637. Whether Weber was law abiding may depend on the outcome of this case, but at the time of his arrest, he certainly wasn't a "responsible citizen" and he wasn't acting in self-defense.

**{¶ 84}** The analogy to mental illness presents a strong basis for upholding the restriction. But I agree with the dissent that it is important to look more deeply at history and tradition. Thus, it is worth exploring the historical explanations for the restrictions on firearms ownership by felons and the mentally ill.

### B. *The Understanding of the Second Amendment Right at the Time of its Enactment*

**{¶ 85}** As Justice Scalia explained in *McDonald*, "[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *McDonald*, 561 U.S. at 803-804, 130 S.Ct. 3020, 177 L.Ed.2d 894 (Scalia, J., concurring). So at the outset, it is important to understand the scope of the historical inquiry. It seems clear that laws identical to R.C. 2923.15 did not exist at the time of the founding. But that is not the question. The question is whether the scope of the Second Amendment right as it was originally understood would have precluded Congress from enacting a restriction like R.C. 2923.15.

**{¶ 86}** Think about it this way. A casual glance at current practice can tell us that we (thankfully) do not yet live in a dystopian world in which the General Assembly has outlawed everything it could constitutionally outlaw. For instance, the legislature is not constitutionally prohibited from making it illegal to drive faster than 35 miles per hour on public highways, but fortunately it hasn't chosen to do so. If someone 100 years in the future looked back on the present era, noted that a great many things weren't outlawed, and drew the inference that those things were beyond the power of the General Assembly to outlaw, he would seriously misunderstand our current system of law. Thus, the historical analysis has to involve more than simply looking for founding-era equivalents to R.C. 2923.15.

**{¶ 87}** This point is driven home by the Supreme Court's recognition in *Heller* and *McDonald* of "presumptively lawful" restrictions on felons and the mentally ill. *Heller*, 554 U.S. at 627, 128 S.Ct. 2783, 171 L.Ed.2d 637, fn. 26;

*McDonald* at 786. Before 1791, "laws disarming the mentally ill * * * simply d[id] not exist." Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1378 (2009); *see also id*. at 1376 ("One searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership"). The same goes for the felon exception. *Id*. at 1374 ("no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms"); *see also* Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 Harv.J.L. & Pub.Pol'y 695, 708 (2009) ("one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I").

{¶ 88} Because of the lack of close historical analogues, courts and commentators have looked at the understanding of the Second Amendment right at the time of the founding when assessing the scope of permissible restrictions on gun ownership by felons and the mentally ill. This inquiry recognizes that the question is not whether there is a founding-era version of a modern prohibition, but whether the right was originally understood in such a way as to make the modern prohibition lawful. Two explanations of the original understanding of the Second Amendment right—one based on dangerousness and one rights based—are particularly persuasive.[3] And both weigh in favor of the restriction on gun use by the intoxicated.

---

3. A third explanation that has been has been cited by numerous courts ties the Second Amendment right to the concept of a virtuous citizenry. *See, e.g.*, *Yancey*, 621 F.3d at 684-685 ("most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens' "). Because I find that explanation less persuasive and underprotective of the Second Amendment right, I do not elaborate on it here. *See generally Kanter*, 919 F.3d at 462-464 (Barrett, J. dissenting) (debunking the idea that the Second Amendment should be understood as applying only to virtuous citizens). Under that rationale, though, the restriction on one who is presently intoxicated would easily pass constitutional muster.

*1. The Founding Generation Understood that the Right to Bear Arms Did Not Preclude Placing Restrictions on Classes of People Who Presented a Present Danger to Others*

{¶ 89} There is considerable historical evidence that restrictions on firearm use by those who presented a present danger to others fell outside the Second Amendment right. Both Judge (now Justice) Barrett, formerly of the Seventh Circuit, and Judge Hardiman of the Third Circuit have engaged in a detailed analysis of the historical evidence from the time of the founding to determine the public understanding of the Second Amendment at the time of its enactment. In the words of Judge Barrett, founding-era "legislatures disqualified categories of people from the right to bear arms only when they judged that doing so was necessary to protect the public safety." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). "History," she explained, "is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Id.* Judge Hardiman reached a similar conclusion: "the best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public." *Binderup v. Atty. Gen.*, 836 F.3d 336, 358 (3d Cir.2016) (Hardiman, J., concurring in part). *See also* Greenlee, *The Historical Justification for Prohibiting Dangerous Person from Possessing Arms,* 20 Wyo.L.Rev. 249, 286 (2020) (surveying the historical evidence from the English tradition forward and concluding that "[h]istory shows that the right [to bear arms] could be denied only to mitigate threats posed by dangerous persons").

{¶ 90} I will only endeavor to briefly summarize the comprehensive historical materials relied upon by the two jurists here; interested readers will be far better served to turn to the opinions in *Kanter* and *Binderup*.

{¶ 91} The strongest evidence comes from debates and proposals at the state ratifying conventions. At the Pennsylvania convention, antifederalists proposed language preventing the government from disarming the people except for

" '*crimes committed, or real danger of public injury from individuals*.' " (Emphasis added in *Binderup*). *Binderup* at 367, quoting The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, *reprinted in* 2 Schwartz, *The Bill of Rights: A Documentary History* 665 (1971). At the Massachusetts convention, Samuel Adams proposed an amendment that would have guaranteed the right to bear arms to the people of the United States " '*who are peaceable citizens*.' " (Emphasis in *Binderup*.) *Id.*, quoting Journal of Convention: Wednesday February 6, 1788, *reprinted in Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788*, at 86 (White 1856). At the time of the Massachusetts convention, " 'peaceable' was defined as '[f]ree from war; free from tumult'; '[q]uiet; undisturbed'; '[n]ot violent; not bloody'; '[n]ot quarrelsome; not turbulent.' " *Kanter* at 455, quoting 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed.1773). And at the New Hampshire convention, it was proposed that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Binderup* at 367, quoting 2 Schwartz at 761. "[T]aken together as evidence of the scope of founding-era understandings * * * [t]he concern common to all three [proposals] * * * is about threatened violence and the risk of public injury." *Kanter* at 456, citing *Binderup* at 368. *See also Binderup* at 367, citing Halbrook, *The Founders' Second Amendment* 190-215; *id*., quoting Halbrook at 196 ("surveying the debates at the ratifying conventions and identifying the commonplace understanding that 'dangerous persons could be disarmed' ").

{¶ 92} Restrictions in place before and during the founding era further support this understanding. Laws in place in 17th-century England allowed for the disarming of people who were thought to pose a threat to public safety. *Kanter* at 456-457; *Binderup* at 368. And "[s]imilar laws and restrictions appeared in the American colonies, adapted to the fears and threats of that time and place." *Kanter* at 457; *Binderup* at 368. Thus, Judge Barrett was able to conclude that "[i]n sum,

founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter* at 458. *See also* Marshall, 32 Harv.J.L. & Pub. Pol'y at 727-728 (concluding after a survey of English and colonial law that the right to bear arms was understood to be subject to restriction based upon "credible grounds for fearing that a member of [a class] would, if armed, pose a genuine present danger to others"); Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist.Rev. 139, 160 (2007) (classes of people thought by colonial-era governments to pose a danger through their use of guns were placed outside of the body politic entitled to the protection of the Second Amendment; these groups included nonassociators who refused to pledge loyalty, slaves, and Indians).

{¶ 93} Moreover, even as to groups who were free from restrictions on the *ownership* of guns, colonial-era legislatures still placed restrictions on uses of weapons that posed a present danger to others. This is particularly relevant here because what is at issue is not a restriction on Weber's right to own a weapon but on his right to use his weapon in a reckless manner that endangered others.

{¶ 94} As early as the mid-1600s, Virginia had passed a law imposing a fine on those who "shoot any guns at drinking." Act of March 10, 1655, 1655 Va.Laws 401. Around the time of the founding, a Virginia law allowed the state to confiscate the arms of those who "ride armed by night [or] by day, in fair or markets, or in other places, in terror of the county." An Act Forbidding and Punishing Affrays, 1786 Va.Laws 35. A New York ordinance prohibited the discharge of weapons "in any street, lane or alley, garden or other inclosure, or from any house, or in any other place where persons frequently walk." An Act for the More Effectual Prevention of Fires in the City of New York, 1761-1775 N.Y.Laws 548 (1769). A 1771 New Jersey law made it illegal to "set any loaded Gun in such Manner, as that the same shall be intended to go off or discharge itself, or be discharged by any

String, Rope or other Contrivance." William Paterson, Laws of the State of New-Jersey 21 (1800). And, in the mid-1700s, several cities, including Philadelphia, New York, and Boston, prohibited the firing of weapons in the crowded cities altogether. Churchill, 25 Law & Hist.Rev. at 162. Eventually, Pennsylvania and New York extended this prohibition to all other towns. *Id.* Massachusetts and Delaware barred the presence of armed assemblies in public places, and Delaware's prohibition explicitly included polling places. An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, 1750 Mass. Acts 333, 339; Article XXVIII, Delaware Constitution (1776).

{¶ 95} Regulations on the storage and transport of gunpowder were expressly enacted for public safety. Cornell & DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.Rev. 487, 510-512 (2004). Statutes set limits on the amount of gunpowder that could be stored in homes and dictated where and how it could be stored. *Id.* at 511-512. Pennsylvania, for example, mandated that gunpowder be stored on the top story of homes in the borough of Carlisle. An Act for Erecting the Town of Carlisle, in the County of Cumberland, into a Borough, Section XLII, 1781-1782 Pa.Laws 25. Some laws restricted the storage of firearms themselves. In Massachusetts, storing loaded firearms in a home in Boston was prohibited, and improper storage could lead to forfeiture. An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder within the Town of Boston, 1783 Mass.Acts 218. In *Heller*, the majority found the existence of such laws did not justify a complete ban on handguns, noting that such laws "do not remotely burden the right of self-defense as much as an absolute ban on handguns." 554 U.S. at 632, 128 S.Ct. 2783, 171 L.Ed.2d 637. But here the opposite is true. Forcing someone to keep his gunpowder (or today, ammunition) away from his firearm would impose a far greater burden on the right to self-defense than requiring Weber, who wasn't acting in self-defense, to refrain from handling his weapon until he sobered up.

{¶ 96} There is compelling evidence that in the founding era, the Second Amendment would have been understood to allow disarming someone who posed a present danger to others. Plainly, someone who is intoxicated and wields a firearm falls into this category. There was a reason Weber's wife felt it necessary to call 9-1-1.

2. *Under a Rights-Based Approach, R.C. 2923.15 Is Consistent with the Second Amendment*

{¶ 97} Another way to approach the historical inquiry is by focusing on the understanding of a right at the time of the Second Amendment's enactment. Judge Batchelder of the Sixth Circuit applied such an approach in her concurrence in *Tyler II*, 837 F.3d 678, which explored the historical basis for restrictions on firearm ownership by the mentally ill. I will only briefly summarize the extensive materials that she relied upon here.

{¶ 98} Because the Second Amendment protects "the *right of the people* to keep and bear arms" (emphasis added), it is worthwhile to examine the 18th-century understanding of the meaning of a right. At the time of the founding, "the idea of right was intimately connected with the idea of reason, a term that referred not only to the 'faculty of the mind by which it distinguishes truth from falsehood [and] enables the possessor to deduce inferences from facts or from propositions,' but also to the mind's ability to distinguish 'good from evil.' " (Brackets sic.) *Tyler II* at 704-705 (Batchelder, J., concurring), quoting 2 Noah Webster, *An American Dictionary of the English Language* (1828). Eighteenth-century theorists such as John Locke, Jean Jacques Burlamqui, and James Wilson all drew close connections between the exercise of a right and reason. *Id*. at 705. Locke, for example, described man's natural state, in which he enjoyed all of his natural rights, "as a state of perfect freedom cabined only by 'the law of nature,' which he defined as the rule 'of reason and common equity, which is that measure God has set to the actions of men, for their mutual security.' " (Emphasis deleted.) *Id*. at 705, quoting

Locke, *Two Treatises of Government* (1691), reprinted in 4 Locke, *The Works of John Locke* 207, 342 (12th ed.1824).

{¶ 99} This understanding was widely accepted by the founding generation, who believed that "rights could, in the central case, be exercised only by those possessing reason." *Id*. at 705; *see also Mai v. United States*, 974 F.3d 1082, 1089 (9th Cir.2020) ("influential philosophers of the [founding era] understood that rights attach with the attainment of 'reason' and correspondingly, the loss of rights persisted only through the loss of reason") (Bumatay, J., dissenting from the denial of rehearing en banc). Thus, insane persons or minors who had not obtained the age of reason could not exercise all of their natural rights because they lacked the reason by which to do so. *Id.* By the same token, "an insane person could not justly be subjected to many of the obligations that corresponded to those rights, such as criminal liability." *Id.*

{¶ 100} Similar logic applies to someone who is intoxicated. A person who is intoxicated has a reduced ability to make reasoned judgments. And certainly, that was the case here. Weber had glassy and bloodshot eyes, his speech was slurred, and he was unable to stand without swaying. The deputy at the scene was unable to administer the horizontal-gaze nystagmus test because Weber would not follow directions. Weber seemed "confused" and was unable to supply a definite answer to questions. Under the conception of the right held by the founders, Weber could be deprived of his right until he sobered up because until that point, he was not capable of reasonably exercising it.

{¶ 101} There is, of course, nothing incompatible about the rights-based approach to the historical evidence used by Judge Batchelder and the focus on dangerousness employed by Judges Hardiman and Barrett. There is strong evidence that the founding generation believed that those who posed a present danger to others fell outside of the Second Amendment's protection. There is also good reason to think that the founding generation believed the ability to exercise a

right was closely connected to one's use of reason. Under both understandings, precluding someone who is presently intoxicated from using a firearm is perfectly compatible within the original public meaning of the Second Amendment.

3. *Legal Prohibitions in 18th- and 19th-Century America Relating to Alcohol and Firearms Further Demonstrate that the Application of R.C. 2923.15 Did Not Violate Weber's Second Amendment Rights*

{¶ 102} The explicit reference in *Heller* and *McDonald* to "presumptively lawful" restrictions on felons and the mentally ill supports the constitutionality of R.C. 2923.15. *See Heller*, 554 U.S. at 627, 128 S.Ct. 2783, 171 L.Ed.2d 637, fn. 26; *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020, 177 L.Ed.2d 894. So too does the available evidence about the founding generation's understanding of the scope of the right to bear arms. The *Heller* court also endorsed consideration of "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *Heller* at 605. And while legislative enactments dealing with drunken firearm use were not ubiquitous during that time period, the available materials all support the notion that the right to bear arms does not encompass an unconditional right to be drunk and handle a firearm.

{¶ 103} The idea that the government may protect its citizens from the dangers of drunks wielding firearms is backed up by history and tradition. In addition to the materials cited in the previous section about disarming those who posed a danger to others, there were also specific laws relating to guns and alcohol. Virginia had early restrictions on firing guns while intoxicated and required violators to forfeit 100 pounds of tobacco. Act of March 10, 1655, 1655 Va.Laws 401. Around the same time, a New York law explicitly recognized the "deplorable accidents such as wounding" caused by the drunken firing of guns on New Year's and May Days and so prohibited the firing of guns on those days. Ordinance of The Director General and Council of New Netherland to Prevent Firing Of Guns, Planting May Poles and Other Irregularities Within This Province, 1665 N.Y. Laws

205. And one suspects that alcohol was on the minds of legislators when the state of Pennsylvania, in 1774, outlawed "wantonly, and without reasonable occasion, discharg[ing] and fir[ing] off any hand-gun, pistol or other fire-arms" around the New Year. An Act to Suppress the Disorderly Practice of Firing Guns, etc., on the Times Therein Mentioned, 1759-1776 Pa.Acts 421, Section 1. So too when New York, in 1785, prohibited firing guns entirely "on the eve of the last day of December, and the first and second days of January" because, apparently, "great dangers have arisen, and mischief been done." An Act to Prevent the Firing of Guns and other Fire Arms within this State on Certain Days Therein Mentioned, 1784-1785 N.Y. Laws 152.

{¶ 104} The examples continue right through the beginning of the 20th century. In Kansas, an 1868 statute prohibited any person "under the influence of intoxicating drink * * * [from] carrying on his person a pistol, bowie-knife, dirk or other deadly weapon." 1868 Kan.Sess.Laws 66. An 1883 Missouri statute prohibited one from having or carrying "any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks." *State v. Shelby*, 2 S.W. 468, 469 (Mo.1886). In Texas in 1871, a court rejected a constitutional challenge in which the person had been convicted of carrying a firearm while intoxicated. *English v. State*, 35 Tex. 473, 474-477, 480 (1871). And in Ohio in 1900, this court upheld a law aimed at disarming vagrants, explaining that if one "employs those arms which he ought to wield for the safety and protection of his country, his person, and his property, to the annoyance and terror and danger of its citizens, his acts find no vindication in the bill of rights." *State v. Hogan*, 63 Ohio St. 202, 218-219, 58 N.E. 572 (1900).

{¶ 105} Weber correctly points out that the founding generation drank a lot of alcohol. But there was also a lot of regulation of drinking at the same time. Indeed, alcohol and alcohol consumption was probably the most regulated subject in the early republic. Drunkenness generally was not well accepted and was a crime

throughout the colonies. Sismondo, *America Walks into a Bar* 11 (2011); Lender, *Drinking in America: A History* 17 (1987). By the time of the founding, each colony had "developed an extensive legal code to combat all aspects of liquor violations." Lender at 17. Drunkards were often heavily punished, receiving jail time, fines, and even corporal punishment. *Id.* In Massachusetts, some of the worst offenders were forced to wear the scarlet letter "D." *Id.* Taverns—the vital center of colonial towns—were heavily regulated in all states. Sismondo at 4, 15. In Virginia after 1638, for example, "there was more law on the books regarding the licensing of taverns than there was on 'roads, land titles, care of the poor and general law and order.' " Sismondo at 15.

{¶ 106} Other laws more explicitly recognized the dangers intoxicated individuals could pose. An 1817 Pennsylvania law, for example, mandated a suspension of not less than one year for any pilot "intoxicated with drink," "whilst having charge of a ship or vessel." A Supplement to the Act, entitled "An Act to Establish a Board of Wardens for the Port of Philadelphia, for the Regulation of Pilots and Pilotages, and for Other Purposes Therein Mentioned," 1816 Pa.Laws 109. An 1854 statute made it a crime to "[w]ilfully furnish[] intoxicating drinks * * * to any person of known intemperate habits, to a minor, or to an insane person" or to "any person when drunk or intoxicated." An Act to Protect Certain Domestic and Private Rights, and Prevent Abuses in the Sale and Use of Intoxicating Drinks, 1854 Pa.Laws 663. During the 18th century in particular, governments were sure to restrict the sale of alcohol to Indians and slaves, believing them to be especially susceptible to violence when intoxicated. Lender at 21-29. Clearly, drunkenness was understood to have adverse effects on society, and those viewed as dangerous with alcohol were either prohibited from consuming it or were restricted from partaking in other activities once intoxicated. Thus, members of the founding generation would have found nothing incongruent about regulating one's alcohol use while using a gun.

{¶ 107} There is also no question that colonial Americans understood intoxication could be grounds for the temporary suspension of one's ability to exercise a protected right. The Statutes of Ohio and the Northwestern Territory, for example, provided that if "any person by being intoxicated, shall be found making or exciting any noise, contention or disturbance, at any tavern, court, election, or other meeting" that person could be fined or "imprisoned. 'till such court, election or meeting is over." Salmon P. Chase, Statutes of Ohio and of the Northwestern Territory, Adopted or Enacted from 1788 to 1833 Inclusive: Together with the Ordinance of 1787; the Constitutions of Ohio and of the United States, and various Public Instruments and Acts of Congress 503 (1833). Similarly, an 1811 Maryland statute made it unlawful to supply " 'spirituous or fermented liquors * * * on the day of any election hereafter to be held in the several counties of' " Maryland. *Cearfoss v. State*, 42 Md. 403, 406 (1875) citing 1865 Md.Laws 361; Dylan Lynch, *Ballots and Beer: America's Tipsy Relationship*, (August 23, 2018), https://www.ncsl.org/blog/2018/08/23/ballots-and-beer-americas-tipsy-relationship.aspx (accessed Dec. 12. 2020) [https://perma.cc/8F3T-TAWM ] (dating this prohibition to 1811). Simply because the right to vote and the right to assemble were considered fundamental rights did not mean that the government could not restrain someone from exercising those rights while they were intoxicated.

{¶ 108} To be sure, none of these laws exactly match the statute at issue here. But there is no reason to insist that our current concerns need to match those of the founding generation. What is important is whether under the original public understanding of the Second Amendment, R.C. 2923.15 as applied to Weber infringed upon constitutionally protected conduct. Text, history, and tradition all demonstrate that it did not.

## IV. Conclusion

{¶ 109} The right to bear arms guaranteed by the Second Amendment and the Ohio Constitution is entitled to this court's full protection. It should not be diminished through the use of an interest-balancing test that is unmindful of text, history, and tradition. History and tradition, though, teach that the right did not give license to Frederick Weber to endanger his wife by drunkenly wielding his gun. Accordingly, I concur in the decision to uphold Weber's conviction. But because the lead opinion applies an intermediate-scrutiny standard that fails to afford the Second Amendment right the protection it is due, I concur only in its judgment.

_____

**FISCHER, J., dissenting.**

{¶ 110} In this case, we are asked to decide whether the application of R.C. 2923.15(A) to a defendant charged with carrying a firearm in his home while under the influence of alcohol is unconstitutional in light of the Second Amendment to the United States Constitution. We are also asked to decide what the appropriate method of review is in such a case.

{¶ 111} The answer to the latter of these questions is that laws and regulations challenged under the Second Amendment must be judged according to the text, history, and tradition of the Second Amendment. Because that was not the standard applied below, there is no need to go any further in the analysis, and this cause should be remanded to the Twelfth District Court of Appeals for further proceedings on the constitutionality of R.C. 2923.15 under that test. Because the court does otherwise, I respectfully dissent.

## I. BACKGROUND

{¶ 112} The Second Amendment to the United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." R.C. 2923.15

makes it a misdemeanor for a person under the influence of alcohol or drugs to "carry or use any firearm or dangerous ordnance."

{¶ 113} Appellee, the state of Ohio, charged appellant, Fred Weber, with violating R.C. 2923.15. It is undisputed that Weber was both under the influence of alcohol and carrying a shotgun when the deputy sheriffs responding to his wife's 9-1-1 call arrived on the scene. What is at issue then is whether his conduct was protected by the Second Amendment to the United States Constitution, which applies fully in this state. *McDonald v. Chicago*, 561 U.S. 742, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

{¶ 114} At his bench trial, Weber unsuccessfully argued that criminalizing the act of holding a firearm while under the influence of alcohol is unconstitutional when that conduct occurs entirely inside the home. Following his conviction, Weber raised that same argument on appeal. 2019-Ohio-916, 132 N.E.3d 1140, ¶ 10-11. Like the trial court, the Twelfth District Court of Appeals found Weber's constitutionality argument unpersuasive. Specifically, after applying intermediate scrutiny, the Twelfth District held that R.C. 2923.15 does not violate a person's constitutional right to keep and bear arms because the law is "narrowly tailored to serve the significant government interest of guarding public safety and leaves open alternate means of exercising the fundamental right to bear arms." *Id.* at ¶ 27.

{¶ 115} After the Twelfth District issued its decision, we accepted Weber's discretionary appeal. *See* 156 Ohio St.3d 1452, 2019-Ohio-2780, 125 N.E.3d 941.

## II. ANALYSIS

### A. Method of Review

{¶ 116} Because Weber challenged the validity of applying R.C. 2923.15 to the facts of his case under the Second Amendment, we must first decide what method of review is appropriate when a court in this state is tasked with considering a challenge to a law or regulation on the grounds that it violates the Second Amendment.

{¶ 117} Before answering that question, it is useful to examine why that question is now before us as well as why that question is a difficult one to answer. Following the United States Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and *McDonald*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894, judges across the federal-court system have been in open disagreement with one another on what the appropriate method of review is in Second Amendment cases. The predominant approach is to utilize a convoluted interest-balancing test in which one level of scrutiny gets applied in some cases and another level of scrutiny gets applied in others. *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir.2010); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir.2010); *United States v. Reese*, 627 F.3d 792, 800-801 (10th Cir.2010); *Ezell v. Chicago*, 651 F.3d 684, 701-703 (7th Cir.2011); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir.2012). At the same time, a not insignificant number of judges have criticized that test, arguing instead that the proper approach in these cases is to look at the text, history, and tradition of the Second Amendment. *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 451-453 (7th Cir.2019) (Barrett, J., dissenting); *Tyler v. Hillsdale Cty. Sheriff's Dept.*, 837 F.3d 678, 702 (6th Cir.2016) (en banc) (Batchelder, J., concurring in part and concurring in judgment); *Binderup v. Atty. Gen.*, 836 F.3d 336, 367 (3d Cir.2016) (en banc) (Hardiman, J., concurring in part and concurring in judgment); *Heller v. District of Columbia*, 670 F.3d 1244, 1272-1273 (D.C.Cir.2011) (Kavanaugh, J., dissenting).

{¶ 118} The parties in this case, perhaps due to the confusion in this area, each ask us to apply a different level of scrutiny. The lead opinion heeds that call and adopts the interest-balancing test created by the federal courts. Consistent with the United States Supreme Court's decisions in *Heller* and *McDonald*, however, I would not adopt such a test. Instead, I would hold that the appropriate inquiry is to

evaluate the challenged law or regulation according to the text, history, and tradition of the Second Amendment.[4]

{¶ 119} In *Heller*, the court notably did not employ an interest-balancing test when faced with a Second Amendment challenge. Rather, the court resolved that case by focusing on the text, history, and tradition of the Second Amendment. For example, the court started by conducting an extensive analysis of the text of the Second Amendment, 554 U.S. at 582-591, 128 S.Ct. 2783, 171 L.Ed.2d 637, which it found protected the right of a citizen to have and to carry weapons in case of confrontation, *id.* at 592. The court went on to confirm its interpretation of the text by looking at the history and tradition of the right. *Id.* at 592-619. Specifically, the court considered the right's English roots, *id.* at 592-594, the understanding of the right in colonial America, *id.* at 594, analogous provisions in state constitutions that were adopted following the Declaration of Independence, *id.* at 600-603, postratification commentaries from "founding-era legal scholars," *id.* at 605-610, early-American case law, *id.* at 610-614, and 19th-century laws and commentaries, *id.* at 614-619, which the court found "instructive" of "the origins and continuing significance of the Amendment," *id.* at 614. The court then concluded by noting that the right was not unlimited and that regulations and restrictions were permissible, so long as there were historical justifications for those regulations and restrictions. *Id.* at 626-635.

---

4. It is worth stating here that deciding this case would have been much simpler if this court had only had more guidance in this area. Hopefully, upon seeing the scores of pages that this court has added to the subject today, the United States Supreme Court will consider this issue and will provide some much-needed clarity on how to approach a challenge to a law or regulation under the Second Amendment.

{¶ 120} Collectively, from start to finish, the approach in *Heller* suggests that the proper method of review in Second Amendment cases is to look at the text, history, and tradition of the Second Amendment to see if the challenged law or rule is consistent with the scope of the right as originally understood. *See id.* at 634-635 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them * * *").

{¶ 121} In *McDonald*, the court employed a similar methodology to decide that the right to keep and bear arms is applicable to the states under the Fourteenth Amendment. 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). In doing so, a plurality of the court stated that *Heller* should be understood as rejecting an interest-balancing test in favor of an approach that focuses on the original understanding of the Second Amendment. *McDonald* at 785.

{¶ 122} The benefit of the *Heller* and *McDonald* approach is that while "[h]istorical analysis can be difficult," *McDonald* at 803 (Scalia, J., concurring), looking at the text, history, and tradition of the Second Amendment when deciding a constitutional challenge under that provision is far more consistent with our system of government and the judiciary's role in that system than simply applying an interesting-balancing test. After all, "the Constitution cannot secure the people's liberty any less today than it did the day it was ratified," *Oil States Energy Servs., L.L.C. v. Greene's Energy Group, L.L.C.*, ___ U.S.___, ___ 138 S.Ct. 1365, 1381, 200 L.Ed.2d 671 (2018) (Gorsuch, J., dissenting), and it is up to us as judges to ensure that is so. The Federalist No. 78 at 467-470 (Alexander Hamilton) (Clinton Rossiter Ed.1961).

{¶ 123} Consequently, following *Heller* and *McDonald*, to determine whether an Ohio law or regulation is constitutional under the Second Amendment, I would look to the text, history, and tradition of the Second Amendment to see if the challenged law or rule is consistent with the original understanding of the Second Amendment and is thus constitutional. In other words, I would let the

original understanding of the scope of the right inform the government's ability to restrict a person's right to keep and bear arms.

## B. Remand for Application to R.C. 2923.15

{¶ 124} Because the court below applied a different method of review, I would decline to answer whether R.C. 2923.15 is constitutional, and I would reverse and remand the cause to the court of appeals for further proceedings on that issue.

{¶ 125} Giving the parties the chance to brief and argue this question through the adversarial process is both fair and wise. First, doing so would prevent the parties from being penalized simply because there previously was not a clear method of review in these types of cases. Next, doing so would also help to ensure that the right result, one way or the other, is eventually reached in this case. Reaching the correct result is especially important here because we are dealing with the constitutionality of a law passed by the General Assembly and an individual's liberty.

{¶ 126} Of course, given the scant briefing done by Weber's lawyers here, it is worth reminding both parties that under this approach, each side would need to marshal significant historical evidence in support of their understanding of the Second Amendment. It is not enough to simply claim that the existence of a right invalidates an otherwise presumptively valid law. Likewise, it is not enough to rest solely on the fact that laws passed by the General Assembly are presumptively valid. Instead, the parties must show their work and explain, with the help of support, why the law in question is or is not constitutional.

{¶ 127} Another word of caution is appropriate here about some language in *Heller* that has given courts and litigants alike some trouble over the years. Toward the end of *Heller*, the court stated that its decision was limited to the law before it and was not intended to cast doubt on any other restrictions, including "prohibitions on the possession of firearms by felons and the mentally ill, or laws

forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-627, 128 S.Ct. 2783, 171 L.Ed.2d 637. A number of courts, including this court and the court of appeals in this case, have used that language as a shortcut to upholding other laws challenged under the Second Amendment. That very clearly was not the point of that passage, however. In fact, as mentioned above, the court in *Heller* was quite explicit that the validity of those and other restrictions should be evaluated in future cases based on the text, history, and tradition of the Second Amendment. *Id.* at 635. So, rather than validating any of the restrictions mentioned by the court, *Heller*'s commentary on those restrictions is essentially dicta. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir.2010); *see also Cohens v. Virginia*, 19 U.S. 264, 399, 5 L.Ed. 257 (1821) (if general expressions in an opinion go beyond the case, "they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision"). Courts and litigants should therefore exercise caution before relying on that language in *Heller* and should still focus on the text of the Second Amendment and the applicable history and tradition of the right.

{¶ 128} Accordingly, with the preceding in mind, I would remand the cause to the court of appeals for further proceedings on whether R.C. 2923.15 is unconstitutional as applied in this case. On remand, I would expect the court and the parties to rely on the text, history, and tradition of the Second Amendment to answer that question.

### III. CONCLUSION

{¶ 129} For the reasons stated above, I would reverse the judgment of Twelfth District Court of Appeals and remand this cause to that court for further proceedings. Because the court does differently, I respectfully dissent.

KENNEDY and FRENCH, JJ., concur in the foregoing opinion.

————————————

D. Vincent Faris, Clermont County Prosecuting Attorney, and Nick Horton, Assistant Prosecuting Attorney, for appellee.

Gary A. Rosenhoffer, for appellant.

Jones Day, Yvette McGee Brown, and Benjamin C. Mizer, urging affirmance for amici curiae Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence.

Zach Klein, Columbus City Attorney, and Charles P. Campisano, Assistant City Attorney; and Every Town Law, Eric Tirschwell, Mark Anthony Frasseto, and Krystan Hitchcock, urging affirmance for amicus curiae city of Columbus.

Paula Boggs Muething, Cincinnati City Solicitor, and Emily Smart Woerner and Jacklyn Gonzales Martin, Assistant City Solicitors, urging affirmance for amicus curiae city of Cincinnati.

Eve V. Belfance, Akron Director of Law, urging affirmance for amicus curiae city of Akron.

Barbara Doseck, Dayton City Attorney, and John C. Musto, Assistant City Attorney, urging affirmance for amicus curiae city of Dayton.

Anthony L. Geiger, Lima Law Director, urging affirmance for amicus curiae city of Lima.

Dale R. Emch, Toledo Director of Law, urging affirmance for amicus curiae city of Toledo.

—————————