[Cite as *State v. Riffee*, 2025-Ohio-4886.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-240535 |
|  |  | TRIAL NO. | 23/CRB/15255/A |
| Plaintiff-Appellant, | : |  |  |
| vs. | : |  |  |
|  |  | *JUDGMENT ENTRY* |  |
| BENJAMIN RIFFEE, | : |  |  |
| Defendant-Appellee. | : |  |  |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 10/24/2025 per order of the court.**

**By:**_____
   **Administrative Judge**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,

      Plaintiff-Appellant,

  vs.

BENJAMIN RIFFEE,

      Defendant-Appellee.

:

:

:

:

:

:

APPEAL NO.  C-240535
TRIAL NO.    23/CRB/15255/A

*O P I N I O N*

Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: October 24, 2025

*Emily Smart Woerner*, City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Victoria Gooder*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson*, Assistant Public Defender, for Defendant-Appellee.

**Per Curiam.**

{¶1} Since 1974, Ohio law has prohibited an intoxicated individual from using or handling a firearm. This prohibition seems to make sense. Driving cars, handling chainsaws, and wielding deadly weapons all seem to be activities that are best performed while sober. However, only one of these dangerous activities concerns a constitutional right. So, things become a bit more complicated when it comes to laws restricting the use of firearms.

{¶2} The right to bear arms is a right granted to us by the United States Constitution, same as the right to speak freely, be free from unreasonable searches, and refuse to provide free lodging to soldiers. And if a law restricts one of these constitutionally-protected rights and that law is challenged, it becomes this court's job to make sure those constitutional rights are protected. This case presents one such challenge. This principle goes back aways, is fundamental to our democracy, and is ingrained in the history and traditions of this country. *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

{¶3} After remaining unchanged and in force for almost 50 years, Ohio's law prohibiting the drunken use of a gun, codified at R.C. 2923.15, is being challenged in this case as unconstitutional under both our federal and state Constitutions. To address this question, we must follow the mandate of the U.S. Supreme Court and complete a review of historical legal authority to determine if a law restricting the use of a firearm by someone who is intoxicated is consistent with the history and traditions of our great Nation.

{¶4} After completing its thorough review of the history and traditions of our Nation, the trial court below concluded that Ohio's ban on handling a firearm while

intoxicated, contained in R.C. 2923.15, lacked a historical analogue that applied a similar prohibition on an individual's right to carry a firearm, specifically, while intoxicated in their home.

{¶5} While we ultimately disagree with the trial court's conclusion, we do not disagree with its methodology. From our review, it would appear that the trial court followed the requirements set forth in *New York State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022). What may be troubling to some is that by following the decisional framework adopted in *Bruen* and its progeny, it is possible to reach the conclusion that in adopting the Second Amendment, the Founders intended to ensure that the gun rights of the intoxicated shall not be infringed.

{¶6} As set forth below, we conclude that the State's prohibition against handling a firearm while intoxicated is indeed consistent with the history and traditions of gun regulation in this country and is therefore constitutional under both our federal and state Constitutions. Thus, it would appear that, here, history and good sense have found common ground.

### I. Factual and Procedural History

{¶7} On September 1, 2023, a complaint was filed in municipal court alleging that on August 31, 2023, Cincinnati police arrested defendant-appellee Benjamin Riffee at his home for carrying a .45-caliber handgun while intoxicated, in violation of R.C. 2923.15. The charging statute, "Using Weapons While Intoxicated," provides that no person "while under the influence of alcohol or any drug of abuse shall carry or use any firearm or dangerous ordnance."

{¶8} On March 8, 2024, Riffee moved to dismiss the case. Riffee alleged that R.C. 2923.15 violated both the Second and Fourteenth Amendments to the U.S. Constitution, as well as Article 1, Section 4 of the Ohio Constitution.

4

{¶9}   In advance of oral arguments on Riffee's motion, the parties stipulated to the following facts:

[A]t approximately 10:51 p.m., Cincinnati Police Department dispatched officers to the vicinity of 503 Woodlawn Ave based upon a Shot Spotter notification and a 9-1-1 call alleging a single shot fired from a second-floor balcony behind a recently remodeled house. When officers arrived, they encountered Mr. Riffee in his home. Mr. Riffee appeared intoxicated. Mr. Riffee relinquished control of the firearm at 11:57 p.m. He was taken into custody at 12:05 a.m.[,] September 1, around an hour after dispatch.

The stipulated facts made no reference to whether or not Riffee was alone in the home.

{¶10}   On September 6, 2024, the court granted Riffee's motion to dismiss. Specifically, the court granted Riffee's motion with respect to his as-applied challenge to the U.S. Constitution, and to the facial challenge to the Ohio Constitution.

{¶11}   On September 20, 2024, the State filed this appeal.

## II.  Analysis

{¶12}   On appeal, the State raises two assignments of error challenging the lower court's conclusion that R.C. 2923.15 violates the U.S. and Ohio Constitutions. For the reasons set forth below, both assignments of error are meritorious.

### A.  As-Applied Challenge to the U.S. Constitution

{¶13}   Where a trial court dismisses an indictment for purely legal reasons, we review its decision de novo. *State v. Thacker*, 2024-Ohio-5835, ¶ 7 (1st Dist.). However, statutes enjoy a strong presumption of constitutionality that may be rebutted only by the challenging party proving, beyond a reasonable doubt, that the statute in question is unconstitutional. *Klein v. Leis*, 2003-Ohio-4779, ¶ 4. "[D]oubts

regarding the validity of a statute are to be resolved in favor of the statute." *State v. Grevious*, 2022-Ohio-4361, ¶ 9.

**{¶14}** Since Riffee raised an as-applied challenge to R.C. 2923.15 under the U.S. Constitution, we are constrained to assess whether, based on the facts of this particular case, Riffee's rights were unlawfully abridged. *Thacker* at ¶ 7.

**{¶15}** The United States Supreme Court instructs that courts addressing challenges to firearm regulations against the rights granted by the Second Amendment to the U.S. Constitution must look to the history and traditions of this country to determine if the modern firearm regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. *Rahimi*, which followed *Bruen*, clarifies that courts are to ask "why and how" the modern regulation burdens the right, and then see if it imposes "similar restrictions for similar reasons" as laws at the time of our country's founding. *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

### 1. Specific Analogues

**{¶16}** States across the union have historically adopted laws specifically criminalizing intoxicated people from carrying or using firearms. This practice existed long before the time of the founding. *See* Act of Sept. 4, 1632, 1632 Va.Acts 198, Act XLIV (Virginia law, which prohibited "commanders of any plantation" from "spending powder" while drinking); Act of Mar. 10, 1655, 1655 Va.Acts 401, Act XII (prohibited shooting guns while drinking, except at weddings and funerals); Act of May 8, 1746, 1746 N.J.Laws 139, 140-141, § 3 (New Jersey prohibition, which stated that any soldier who appears "in arms disguised in liquor" shall be disarmed); Act of Feb. 16, 1771, Ch. 1501, reprinted in 5 James B. Lyon, *The Colonial Laws of New York from the Year 1664 to the Revolution* 244, 244-245 (1894) (New York law, which criminalized discharging firearms around New Year's festivities because persons were often

intoxicated and would terrorize the public); Act of Mar. 20, 1780, Ch. 902, § 45, reprinted in 2 Arthur Vollmer, *Military Obligation: The American Tradition*, Pt. 11, at 75, 97 (1947) (Pennsylvania law, which stated "if any non-commissioned officer or private shall . . . be found drunk . . . he shall be disarmed . . . until the company is dismissed.").

**{¶17}** Further, laws from the 19th century confirm the pre-founding era practices. *See* Act of Dec. 3, 1825, 1825 Tenn.Priv.Acts 306, Ch. 292 (Tennessee law, which granted a locality the authority to penalize "shooting and carrying guns" while drinking); 1844 R.I. Pub.Laws 501, 503, § 1 (Rhode Island law, which excluded "common drunkards" from militia service); 1867 Kan.Sess.Laws 25 (Kansas law, which prohibited any person under the influence from carrying a deadly weapon); 1878 Miss.Laws 175-76, Ch. 46, § 2-3, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes (Mississippi law, which criminalized the sale of firearms to intoxicated persons).

**{¶18}** While Riffee is correct that the right to bear arms is most acute in the home, Riffee's ability to exercise that right is contingent upon, as the Supreme Court in *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008), noted, doing so in a responsible manner. *Id.* at 635 (holding that the Second Amendment provides a "right to law-abiding, responsible citizens to use arms in defense of hearth or home."). Riffee's argument that being sequestered in his home eliminates the risk to others lacks merit. Should an intoxicated individual, like Riffee, carry or use a firearm around the home, a single discharge could prove lethal to Riffee, another person in the home, a neighbor, or anyone else who happens to be down range.

**{¶19}** Justice DeWine's concurrence in *State v. Weber*, 2020-Ohio-6832, ¶ 57-109 (DeWine, J., concurring), helps to bolster the conclusion that this regulation

7

aligns with our Nation's history and traditions.

**{¶20}** In *Weber*, a pre-*Bruen* case also challenging R.C. 2923.15, Justice DeWine issued an extensive concurrence canvasing the historical evidence on how and why the State restricted persons from carrying firearms. His analysis focused upon many of the same regulations enumerated above. *See Weber* at ¶ 102-104. However, he also cited that colonial Americans long recognized that one's ability to exercise a protected right, like the right to vote or assemble, could be suspended while an individual was intoxicated. *Id.* at ¶ 107.

**{¶21}** Justice DeWine also focused upon the responsibility verbiage in the United States Supreme Court's holding in *Heller*. *Weber* at ¶ 83, citing *Heller*, 554 U.S. at 635. In likening intoxication to mental incapacitation, Justice DeWine's analysis concluded an intoxicated individual could not reasonably exercise their right to bear arms. *Id.* at ¶ 98, citing *Tyler v. Hillsdale Cty. Sheriff's Dept.*, 837 F.3d 678, 705 (6th Cir. 2016) (Batchelder, J., concurring) (noting that 18th century philosophers like John Locke, Jean Jacques Burlamqui, and James Wilson believed that to exercise one's rights, one must possess reason); *see Mai v. United States*, 974 F.3d 1082, 1089 (9th Cir. 2020) (Bumatay, J., dissenting from the denial of rehearing en banc) ("influential philosophers of the [founding era] understood that rights attach with the attainment of 'reason' and correspondingly, the loss of rights persisted only through the loss of reason"); *United States v. Connelly*, 117 F.4th 269, 280 (5th Cir. 2024), citing Dr. Benjmain Rush, *An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind*, 2 (8th Ed., Boston, James Lording 1823) (Dr. Rush, a signatory to the Declaration of Independence, wrote that drunkenness, or the "odious disease" was often coupled with "extravagant acts which indicate a temporary fit of madness.").

{¶22} Both the "how" and the "why" of R.C. 2923.15 are in alignment with historical analogues, in that individuals may not carry or use as long as they are intoxicated, a period the individual has complete and total dominion over—or, at least control over whether they enter into this state. Admittedly, once having voluntarily become intoxicated, when and in what condition an individual emerges from such a state is much less under their control. But, having made the initial choice to become intoxicated, one has voluntarily created a situation where they can no longer safely handle a firearm. And, as a result, they have removed themselves from the rights and protections provided by the Second Amendment.[1] And, as long as those Second Amendment protections are only suspended for so long as they remain in this dangerous, intoxicated state, the restriction is constitutional. *Rahimi*, 602 U.S. at 702 ("An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment.").

{¶23} Accordingly, the State's first assignment of error challenging the trial court's conclusion that R.C. 2923.15, as-applied to Riffee, violates the Second Amendment is sustained.

---

[1] Of course, there are limits to the State's ability to keep firearms out of the hands of those it considers dangerous. A review of the history and traditions of this country reveals that there is a tradition of keeping firearms out of the hands of certain groups of people (e.g., Catholics, Protestants, Blacks, and Native Americans) that the State has deemed dangerous, a practice that is now inconsistent with the protections provided by the U.S. Constitution's Equal Protection Clause contained in the 14th Amendment. *See United States v. Griffin*, 704 F.Supp.3d 851, 857 (N.D.Ill. 2023) ("This Court is disheartened by the Supreme Court's decision to rely on an analysis of laws that existed at this nation's founding to determine the constitutionality of modern gun regulations. Indeed, to interpret modern regulations pertaining to the critically important Second Amendment right to bear firearms for self-defense, the Supreme Court requires that this Court rely on a history and tradition of a nation that at the time would have regarded individuals, including Griffin and this Judge, as three-fifths of a person at best and property at worst."); *see also United States v. Rowson*, 652 F.Supp.3d 436, 466 (S.D.N.Y. 2023) ("There is also ample evidence of colonial and revolutionary-era laws that disarmed groups of people perceived as per se dangerous, on the basis of their religious, racial, and political identities.") (Internal citations omitted.) Fortunately, our country has moved beyond these racist and otherwise discriminatory laws, and this part of our Nation's history and traditions of firearm regulation remains buried in amber where it belongs.

### B. Facial Challenge to the Ohio Constitution

**{¶24}** In its second assignment of error, the State challenges the trial court's conclusion that R.C. 2923.15 is facially unconstitutional under the Ohio Constitution.

**{¶25}** "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2018). While both the trial court and parties apply the *Bruen* analysis, the Ohio Supreme Court has not yet adopted this analytical framework to the Ohio Constitution. *But see State v. Skaggs*, 2024-Ohio-4781, ¶ 71 (5th Dist.) (King, J., dissenting). While we may reasonably predict that the Ohio Supreme Court will ultimately adopt a *Bruen*-like framework, the Court has yet to do so, and we are bound to follow the law as it has currently been interpreted by our state Supreme Court.

**{¶26}** The current legal framework we are tasked with applying arises from *Arnold v. City of Cleveland*, 67 Ohio St.3d 35 (1993). In *Arnold*, the Ohio Supreme Court considered the constitutionality of a Cleveland ordinance prohibiting the possession and sale of assault weapons. *Id.* at 38. The Court considered that "the right to keep and bear arms was 'subject to reasonable regulation' which, under the State's police powers, must 'bear a real and substantial relation' to secure 'the health, safety, morals, or general welfare of the public.'" *Id.* at 46-47; *see Klein*, 2003-Ohio-4479, at ¶ 14-15 (applying the reasonable regulation framework from *Arnold*); *State v. Johnson*, 2019-Ohio-5386, ¶ 26 (3d Dist.), quoting *Arnold* at 46-47. While the Court recognized that a total ban on firearms would be unconstitutional, the Court concluded that despite its broad scope, the ordinance was a reasonable exercise of the municipality's police power. *Arnold* at 49.

**{¶27}** However, the trial court's assertion that *Arnold* meant that "Ohio's right-to-bear-arms clause provides a greater degree of protection than the United

States" to the rights of gun owners may no longer be accurate. *Arnold*, an opinion from 1993, predates *Heller*, *McDonald*, *Bruen*, and *Rahimi*, which have drastically broadened the protections at the federal level.

**{¶28}** Our sister appellate courts have opined that because "the United States Constitution now equally protects the right of the individual to bear arms, we see no obvious distinction between the Ohio Constitution and the United States Constitution." *State v. King*, 2024-Ohio-4585, ¶ 37 (8th Dist.), quoting *State v. Windland*, 2024-Ohio-1760, ¶ 24 (5th Dist.), quoting *State v. Jenkins*, 2024-Ohio-1094, ¶ 28 (5th Dist.); *see State v. Jones*, 2024-Ohio-2959, ¶ 22 (3d Dist.) (applying the *Jenkins* position that the difference between the U.S. and Ohio Constitutions has been eliminated).

**{¶29}** As a result, many courts have concluded that should a regulation survive federal constitutional scrutiny under the *Bruen* framework, then it would also survive scrutiny under the Ohio Constitution. *Id.* This ignores the position that other Ohio courts "have long interpreted the arms-bearing provision in our own constitution as distinct from the analogous federal provision." *State v. Hall*, 2025-Ohio-1644, ¶ 112 (1st Dist.). *Bruen* did not alter the Ohio Supreme Court's analysis of the Ohio Constitution. *Id.* Because *Arnold* is still good law, our analysis focuses upon whether R.C. 2923.15, on its face, is a reasonable regulation. We believe that it is.

**{¶30}** R.C. 2923.15 is tethered to "a real and substantial relation" to secure "the health, safety, morals, or general welfare of the public." *Arnold*, 67 Ohio St.3d at 46, quoting *Cincinnati v. Correll*, 141 Ohio St. 535, 549 (1943). This statute would prohibit someone who is drunk or otherwise intoxicated from carrying a handgun through a parade, firing a celebratory shotgun blast into the air, or any number of other dangerous circumstances where intoxicated individuals are carrying or using a

firearm. In fact, R.C. 2923.15 recognizes that the only safe way for an intoxicated individual to handle a firearm is not to.

{¶31} Perhaps a clearer set of circumstances arises from *Weber*, where police responded to a 9-1-1 call and encountered an individual carrying a shotgun around his home. *Weber*, 2020-Ohio-6832, at ¶ 2. In *Weber*, the individual appeared "very intoxicated," was confused, admitted he was drunk several times to police, smelled of alcohol, had slurred speech, glassy and bloodshot eyes, had difficulty maintaining his balance, and could not comprehend instructions from police to take a field sobriety test. *Id.* at ¶ 3-4. To state that R.C. 2923.15 is facially unconstitutional, this court would have to conclude that regulating the conduct at the heart of *Weber* would be unreasonable. We decline to do so. Therefore, R.C. 2923.15 is constitutional on its face.

{¶32} Accordingly, the State's second assignment of error is sustained.

### III. Conclusion

{¶33} Therefore, this court concludes that under both the U.S. and Ohio Constitutions, restrictions on intoxicated individuals handling firearms during the period of their intoxication represents a reasonable restriction of constitutional rights that is consistent with the history and traditions of gun regulation in this state and this country, and the challenge to the lower court's finding is sustained.

{¶34} Accordingly, we reverse the judgment of the trial court and remand this matter for further proceedings consistent with this opinion and the law.

Judgment reversed and cause remanded.

CROUSE, P.J., and BOCK, J., concur.
MOORE, J., concurs separately.

**MOORE, J.,** concurring separately.

{¶35} While I agree with the court's opinion in this case, I write separately to express my view that, in certain circumstances, such as the case before us, courts could rely upon a more general "dangerousness" analysis to more efficiently assess the constitutionality of a disputed firearm regulation and avoid requiring busy trial courts to have to travel back through the annals of this Nation's history and traditions of firearm regulations.

{¶36} Despite other changes to Ohio laws that have expanded gun rights since the adoption of R.C. 2923.15 in 1974,[2] it was only after the holdings in *Bruen* and its progeny, which required courts to examine the historical record from more than two centuries ago, that we find ourselves faced with a challenge to Ohio's law prohibiting handling a firearm while drunk, high, or otherwise intoxicated.

{¶37} The court below did an admirable job trudging through century-old laws in an effort to find a historical analogue to R.C. 2923.15, a law passed by legislators of the modern era in an effort to protect Ohioans from all the bad things that can happen when guns are in the hands of intoxicated people.[3] The trial court's effort here is especially impressive considering the busy docket faced by this municipal court judge. According to the Ohio Supreme Court, in the year that the decision underlying this

---

[2] In April 2004, Ohio's 125th General Assembly enacted House Bill 12, which permits the issuance of concealed-carry licenses to qualified adults. In June 2022, Ohio's 134th General Assembly enacted Senate Bill 215, known as Ohio's Constitutional Carry law, which granted eligible adults the right to both carry openly and carry concealed without acquiring a license.

[3] The belief that firearms and alcohol don't mix is not only consistent with our country's history and traditions, but is a belief shared by both sides in the debate over gun rights. *See* NRA Family, *Gun Safety & Alcohol Don't Mix!*, https://www.nrafamily.org/content/gun-safety-alcohol-don-t-mix/ (accessed Sept. 8, 2025) [https://perma.cc/WV7E-5TW5]; Everytown for Gun Safety, *Guns in Bars*, https://everytownresearch.org/report/guns-in-bars/ (accessed Sept. 9, 2025) [https://perma.cc/8DC3-8YRT] ("Guns and alcohol don't mix. There is strong evidence that people under the influence of alcohol are at an elevated risk of violent behavior, including gun violence.").

appeal was issued, this particular trial judge was faced with nearly 3,000 new cases.[4] And, while the trial court below was able to undertake this effort and continue to manage a voluminous trial docket, the wisdom and practicality of requiring busy trial judges to have to expend such efforts whenever gun laws are challenged is much less clear.

**{¶38}** As explained below, I believe the concern with dangerousness provides a sufficient nexus between the law at issue and the history and traditions of firearm regulations in this country. And, using such a wider lens, like a focus on dangerousness generally, versus searching for more specific statutory analogues in the historical record, may prove more practical and help lessen the burden on busy trial courts.

*Dangerousness as an Alternative Approach*

**{¶39}** While this dangerousness approach has yet to be specifically adopted by any higher court, the Supreme Court's first case interpreting *Bruen* clarified, "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi,* 602 U.S. at 692 (holding that an individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment). Importantly, the Court in *Rahimi* pointed out that it was able to reach its conclusion without undertaking an exhaustive historical analysis of the full scope of the Second Amendment. *Id.* at 702.

**{¶40}** This court has previously explained the framework that a reviewing court must follow when relying on the dangerousness criterion. Specifically, in

---

[4] Supreme Court of Ohio, *Municipal and County Courts*, https://app.powerbi.com/view?r=ey JrIjoiYjFmY2ViZDgtNzRlOS00ZTVmLWI4MjQtMDE4NGYwNzM4ODQ0IiwidCI6IjgxNzJhOTE 0LWJmOGQtNDZkMy04YjUwLTYwOWU0ZDA0N2QxZiJ9 (accessed Sept. 8, 2025) [https://perma.cc/F2PE-3WT9] (documenting that the judge below heard 2,829 cases in 2024).

*Thacker*, 2024-Ohio-5835 (1st Dist.), we recognized that "history and tradition[s] includes a long-standing practice—dating back to before and during the founding era— of legislatures disarming those they determine to be dangerous, at least for a time." *Id.* at ¶ 54. Such disarmaments based on dangerousness must focus on the danger at hand and need to be tailored to check that danger. *Id.* A disarmament contingent upon "dangerousness" of a class turns on whether (1) the group, reasonably, can be presumed dangerous if they had a firearm, and (2) that the duration is limited to the danger that people belonging to that class pose. *Id.*

**{¶41}** Consistent with the requirements of *Bruen*, our Nation's history and traditions demonstrate that the legislature may disarm individuals they believe are dangerous. As this court stated in *Thacker*:

> Indeed, all the federal and Ohio courts that have addressed this question
> have found as much. [*United States v.*] *Williams*, 113 F.4th 637, 657 (6th
> Cir. 2024) ("our nation's history and tradition demonstrate that
> Congress may disarm individuals they believe are dangerous"); [*United*
> *States v.*] *Jackson*, 110 F.4th 1120, 1128 ("Legislatures historically
> prohibited possession by categories of persons based on a conclusion
> that the category as a whole presented an unacceptable risk of danger if
> armed."); *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J.,
> dissenting) ("History is consistent with common sense: it demonstrates
> that legislatures have the power to prohibit dangerous people from
> possessing guns. But that power extends only to people who are
> dangerous."); *Rahimi* [at 700-701].

*Thacker* at ¶ 45.

**{¶42}** So, both this court and the U.S. Supreme Court have recognized the

15

traditions allowing the State to disarm dangerous individuals. *See Rahimi*, 602 U.S. at 700, 702; *Thacker* at ¶ 54 (holding that our Nation has a "history and tradition" of disarming individuals who pose a particular danger with a firearm).

**{¶43}** After conducting a detailed historical analysis in *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024), the Sixth Circuit Court of Appeals similarly concluded that historical evidence from the early English kings, Parliament, common-law-surety regimes, colonial-era regulations, and statutory law dating back to 1328 demonstrate the history and traditions of disarming individuals that were deemed dangerous. *Id.* at 650-657. The Sixth Circuit concluded, the "nation's history and tradition[s] demonstrate Congress may disarm individuals they believe are dangerous." *Id.* at 657.

**{¶44}** Thus, under this more general "dangerousness" assessment, the trial courts can be relieved of having to undertake the laborious task of performing a historical survey of our Nation's laws in search of the proper analogue, and instead can move forward based on the general guidance that our Nation's history and traditions are consistent with laws restricting the rights of those considered dangerous to handle a firearm during the period of their dangerousness.

**{¶45}** Based upon this more generalized "dangerousness" review, R.C. 2923.15 survives Riffee's constitutional challenge. The "why" is in line with our Nation's long-standing traditions of addressing dangerousness. The "how" is also in line, in that an individual is only disarmed for the period in which they are "dangerous," which in this case lasts as long as the individual is intoxicated. Accordingly, whether examined under a general dangerousness analysis or under a more specific comparison to historical regulations, R.C. 2923.15 is constitutional as applied to Riffee under the U.S. Constitution.

**{¶46}** These cases are not simple. And, there certainly will be cases challenging restrictions on gun rights that are less clear than those present here. However, in those cases where a broader focus on dangerousness is appropriate, this approach may avoid having to send busy trial courts through the annals of our Nation's history and traditions of firearm regulation each time some drunkard decides it's time to play cowboy or there is some other dangerous activity involving firearms being regulated.

**{¶47}** To be clear, no new ground is being tilled here. This concept of taking a broader view is not new, innovative, or unprecedented. Specifically, this approach focusing on dangerousness was described by the U.S. Supreme Court in *Rahimi*, recognized by the Sixth Circuit Court of Appeals in *Williams*, and identified by this court in *Thacker*. And, while we still must await the Ohio Supreme Court's guidance on exactly how *Bruen* should be applied to constitutional challenges to firearm regulations under the Ohio Constitution, for now, this broader focus on dangerousness appears to align with the Court's guidance in *Weber*.

**{¶48}** Allowing this "dangerousness" analysis as an alternative analytical framework in appropriate cases would allow trial courts the option to choose which methodology best suits the facts of the case before it and the practical needs of managing their busy dockets.

**{¶49}** For the reasons explained above, I therefore concur in the court's opinion and judgment.